IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK REYNOLDS : CIVIL ACTION
: NO. 06-1237
v. :
:
THE UNIVERSITY OF PENNSYLVANIA :

O'NEILL, J.                                                          JANUARY 27, 2010

## MEMORANDUM

Beginning on September 29, 2009, a five day jury trial was held in the above captioned matter. At its conclusion, the jury found in favor of Reynolds and awarded him $435,678. Penn thereafter filed a motion for judgment as a matter of law ("JMOL") or, alternatively, for a new trial. Presently before me are Penn's motion, Reynolds's response in opposition and Penn's reply. Oral argument was held on January 21, 2010. For the following reasons, I will deny Penn's motion for judgment as a matter of law and grant its motion for a new trial.

## BACKGROUND

Reynolds was a student in the Executive Masters in Technology Management ("EMTM") program at the University of Pennsylvania. He alleges that at the time he applied to the program Penn officials represented to him that upon completion of the program: (1) he would receive a degree that could be represented as both a degree in management from Wharton and a degree in technology from Penn Engineering; (2) he would be considered a Wharton student with all of the rights, privileges and access to resources available to Wharton students; and (3) he could describe his affiliation as being with the Wharton School, the University of Pennsylvania and/or Penn

Engineering.[1]  At the beginning of his second year in the program, Reynolds allegedly discovered all three representations to be false.[2]

Accordingly, on October 18, 2005, Reynolds commenced this lawsuit by writ of summons in the Philadelphia County Court of Common Pleas.  On March 3, 2006, he filed his complaint and served it upon Penn.  On March 22, 2006, Penn removed the case to this court.[3]

As Reynolds's lawsuit was making its way to this court, a companion case, <u>Harsh v. The University of Pennsylvania, et al.</u>, No. 06-1236, was doing the same.  There, Anurag Harsh, a classmate of Frank Reynolds, complained of similar conduct by Penn.  The cases proceeded along parallel schedules but were never consolidated.

---

[1] This characterization of Penn's misrepresentations is taken from Reynolds's brief in opposition to Penn's post-trial motions.  <u>See</u> Pl.'s Br. at 1.  The characterization is derived from testimony Reynolds gave on cross, <u>see</u> Transcript of Record, Sept. 30, 2009, Frank Reynolds at 82-86, <u>Reynolds v. Univ. of Penn.</u>, No. 06-01237, and later adopted by Reynolds's counsel in closing.  <u>See</u> Transcript of Record, Oct. 5, 2009, Heleniak Closing at 7 (". . . you've heard evidence of what Frank Reynolds was told that the EMTM program would give him.  And if you recall, Mr. Golden, in examining Mr. Reynolds, made a list.  We agree. That is what Mr. Reynolds was told, what Mr. Reynolds bargained for, what Mr. Reynolds committed to when he determined that he would commit himself to the program for an EMTM degree and the $100,000 in tuition that it would cost.").

Reynolds also testified that Penn officials told him he would have "Wharton Alumni Status."  <u>See</u>, <u>e.g.</u>, <u>id.</u> at 84.  In his present brief, he argues that he was told "he could describe his affiliation as being with the Wharton School, the University of Pennsylvania and/or Penn Engineering."  I understand these to be two characterizations of the same representation.

[2] Reynolds originally sued a variety of Penn officials in addition to the University itself.  Before trial began, the parties stipulated to the dismissal of all defendants other than the University.  <u>See</u> Transcript of Record, Sept. 29, 2009 at 3-5.

[3] Reynolds's complaint contained the following eight counts: (1) breach of contract; (2) unjust enrichment; (3) negligence; (4) negligent misrepresentation; (5) intentional misrepresentation; (6) common law fraud; (7) violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. Ann. § 201-9.2(a); and (8) violations of RICO, 18 U.S.C. § 1962(c) & (d).  The inclusion of the RICO claim conferred federal subject matter jurisdiction under 28 U.S.C. § 1331.

2

Discovery continued through the summer of 2007. During that process, Reynolds and Harsh asserted that the alleged misrepresentations by Penn were contained, among other places, in a variety of PowerPoint presentations, websites and emails from Penn administrators. The parties devoted considerable time and energy to the question of whether the documents cited by Reynolds and Harsh were authentic or whether, as Penn alleges, the documents had been altered to support plaintiffs' claims. Penn focused particular attention on a PowerPoint presentation given by Joel Adler, then-associate director of the EMTM program, to a group of prospective students that included Reynolds, and an email from Adler to Harsh answering several questions about the EMTM program. In his complaint, Reynolds included the text of the Adler/Harsh email that he alleges formed the basis of his contract with Penn. Compl. ¶ 86. After review of its own copy of that email, Penn found several material inconsistencies. Likewise, Reynolds also included in his complaint a copy of several of the PowerPoint slides that he alleges were shown to him by Adler at an information session. Compl. ¶ 65, 68, 69. Reynolds confirmed in his deposition that those slides were shown to him by Joel Adler. He claimed he remembered them in part because of the Wharton logo located in the bottom left corner of each slide. Reynolds Dep. 160:1-8, Feb. 6, 2007. Again, review by Penn of its own copy of that PowerPoint presentation revealed several material inconsistencies. After ten successful discovery motions, Penn received copies of the PowerPoint and emails and their data sources.[4] Expert inspection of those data sources lead Penn to conclude that Harsh and/or Reynolds had altered the documents

---

[4] Both Reynolds and Harsh were unable to produce the computers they owned at the time they claim to have downloaded the presentation and emails. Harsh discarded his because it was not working properly, and Reynolds's was destroyed in a house fire. It appears, however, that both plaintiffs had saved copies of the relevant information on their new computers. Def.'s Mot. to Compel. at 5-6, June 14, 2007.

3

to strengthen their cases.  This conclusion was based in part on the fact that the PowerPoint presentation produced by Reynolds and Harsh included a Wharton logo that did not exist until a year after Adler gave the relevant presentation.  The expert also concluded that the PowerPoint presentation was saved using software that wasn't available until May 2003, roughly a year after Reynolds and Harsh claim to have downloaded it.  With respect to the email, expert analysis of computers owned by Reynolds and Harsh revealed three versions of the email stored on Reynolds's computer.  Each is different from the others, and all three differ from the copy obtained from Adler's computer.  In light of this information, Penn concluded that Reynolds and Harsh had committed fraud on the court and moved to exclude all the allegedly doctored evidence.  Def.'s Mot. to Exclude, Aug. 4, 2008.  On September 15, 2008, I denied the motion and held that whether plaintiffs had fabricated evidence was a question of fact to be resolved by a jury.  On the same day, I granted Harsh's motion to dismiss his lawsuit with prejudice.

On September 1, 2009, the remaining parties in this action stipulated to the dismissal of the RICO claim and Reynolds subsequently moved to remand the case to state court.  In the interest of judicial economy, I denied the motion and retained supplemental jurisdiction over the remaining state law claims.

On September 28, 2009, the day before trial began[5], Reynolds filed a "Motion To Preclude Reference To And Evidence Pertaining To Anurag Harsh."  That motion represented a rather dramatic about-face in the positions of both parties.  Just one year earlier Penn had moved for, and Reynolds had opposed, the exclusion of the allegedly altered documents.  Apparently

---

[5] Trial was originally scheduled to begin September 14, 2009.  On September 8, 2009, I continued the trial until September 28, 2009.  Trial actually began on the afternoon of September 29, 2009.

abandoning the position that he took during the discovery phase–that the documents contained Penn's misrepresentations–Reynolds sought to exclude the exhibits on the grounds that they were irrelevant and that their probative value was substantially outweighed by their prejudicial effect. The obvious time constraints prevented Penn from filing full briefing in response to Reynolds's motion. It did, however, submit a letter brief opposing the motion on the grounds that "the altered evidence and related exhibits are relevant [because] that is what Reynolds claims he relied [on] in choosing the EMTM program. Even if Reynolds tries to revise his claim to exclude the altered evidence, he is subject to cross examination against his previous statements made under oath." On the morning of trial, counsel for Penn again registered opposition to the exclusion of the allegedly altered documents. He emphasized that as early as in his complaint Reynolds had asserted that he had been shown the allegedly altered documents during the admissions process. Thus, Penn argued that at minimum it should be allowed to present evidence showing that the documents referenced in the complaint were not the same as those shown in the admissions presentation. In Penn's view, regardless of whether Reynolds had actually altered the documents or even known that they had been altered, the fact that he claimed to have been shown documents that were not included in the admissions presentation would have affected the jury's appraisal of his credibility. In response, Reynolds's counsel asserted that he intended to prove his case without any reference to the allegedly altered documents. I granted the motion to exclude. That ruling provides the basis for Penn's present motions.

## STANDARD OF REVIEW

A.   Motion for Judgment as a Matter of Law

Rule 50(b) of the Federal Rules of Civil Procedure governs the court's ability to grant JMOL after a jury trial. JMOL, a sparingly invoked remedy, is appropriate only where "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000). In determining whether such a legally sufficient evidentiary basis exists, the court must review all the evidence in the record and draw all reasonable inferences in favor of the non-moving party. Id. at 150. The court may not, however, make credibility determinations or weigh the evidence–those functions are reserved for the jury. Id. In sum, a motion for JMOL "should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).

B.      Motion for a New Trial

Rule 59 governs the court's ability to grant a new trial. The rule allows the court to grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P. 59(a)(1)(A). The standard by which a motion for a new trial is judged depends on the grounds upon which the motion rests. Klein v. Hollins, 992 F.2d 1285, 1289-90 (3d Cir. 1993).

Where a new trial is sought on the grounds that the jury's verdict was against the weight of the evidence, the court may grant the motion "only where the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1353

(3d Cir. 1991). This high standard provides due respect for the jury's primary function as factfinder. Otos Tech., Co., Ltd. v. OGK America, Inc., No. 03-1979, 2007 WL 2374995, at *3 (D.N.J. Aug. 13, 2007) (citing Hurley v. Atlantic City Police Dep't., 933 F. Supp. 396, 403 (D.N.J. 1996)).

Where, on the other hand, the asserted basis for a new trial involves a matter originally within the trial court's discretion–e.g., evidentiary rulings–the court has much wider latitude. Klein, 992 F.2d at 1289-90. In such cases, the court's inquiry is twofold: (1) whether an error was in fact committed; and (2) whether that error was so prejudicial that denial of a new trial would be "inconsistent with substantial justice." Farra v. Stanley-Bostitch, Inc., 838 F. Supp. 1021, 1026 (E.D. Pa. 1993) (citing Bhaya v. Westinghouse Elec. Corp., 709 F. Supp. 600, 601 (E.D. Pa. 1989), aff'd, 922 F.2d 184 (3d Cir. 1990)). With respect to the determination of prejudice under the second prong, "a new trial must be granted unless it is highly probable that [the erroneous ruling] did not affect the [objecting party's] substantial rights." Bhaya, 709 F. Supp. at 601-602 (citing McQueeney v. Wilmington Trust Co., 779 F.2d 916, 928 (3d Cir. 1985)).

DISCUSSION

With these standards in mind, I turn now to Penn's arguments in support of its alternative motions. I will first discuss why a grant of JMOL would be inappropriate under these circumstances. Then, I will discuss the factors that have lead me to conclude that a new trial is necessary to ensure Penn's rights are protected.

A.    JMOL Is Inappropriate Because There Is Insufficient Evidence To Support a Finding that Reynolds Committed Fraud on the Court and the Record Contains Sufficient Evidence upon which a Jury Could Find Penn Liable

Penn makes two arguments in support of its motion for judgment as a matter of law. First, it argues that Reynolds has implicitly admitted that his evidence was fraudulent and therefore his lawsuit should be dismissed. Second, it argues that the evidence Reynolds presented at trial did not satisfy his burden of proving the existence of a contract and breach thereof.

    1.    There Is Insufficient Evidence To Support a Finding that Reynolds Committed Fraud on the Court

Penn's first argument relies on cases from other jurisdictions wherein the plaintiffs, in prosecuting their cases, committed fraud on the court. See Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989) (affirming the district court's dismissal of a lawsuit where the plaintiff had attached to his complaint a wholly fictional purchase agreement); Plasse v. Tyco Elecs. Corp., 448 F. Supp. 2d 302, 308 (D. Mass. 2006) (dismissing the plaintiff's complaint after finding clear and convincing evidence of extensive and egregious misconduct). Penn argues that Reynolds's last minute withdrawal of the altered documents constitutes an admission that his primary evidence was fraudulent. Reynolds disagrees, arguing that there has been no evidence submitted that proves either that the documents were altered or that he was aware of or participated in alteration of documents. He also vigorously contends that he has not admitted, implicitly or otherwise, to any involvement with altered documents.

I agree with Reynolds. The Aoude Court noted that "dismissal . . . is an extreme remedy, and should not lightly be engaged." Aoude, 892 F.2d at 1118. Where a motion to dismiss is premised on fraud on the court, such fraud must be proven by clear and convincing evidence. Id.; Plasse, 448 F. Supp. 2d at 308. In Aoude, for example, the decision as to whether the

plaintiff had committed fraud on the court was an easy one–he admitted to it. Aoude, 892 F.2d at 1118-1119 ("By Aoude's own admission, he fabricated the purchase agreement; gave it to his lawyer; read the complaint before it was filed; realized that counsel, acting on his behalf, proposed to annex the bogus agreement to the complaint (thus representing it to be authentic); and nevertheless authorized the filing.").

The evidence presently in the record cannot support a finding by clear and convincing evidence that Reynolds has committed fraud on the court. First, unlike in Aoude, Reynolds has not admitted that the documents upon which his case is based are fraudulent. Quite to the contrary, both in his briefs and at oral argument Reynolds expressly denied making such an admission or relying on fraudulent evidence. Penn's attempt to characterize Reynolds's last minute tactical adjustment as an admission of fraud is unavailing. There are any number of practical reasons why Reynolds would choose to pursue one case theory instead of another. Without much more, I will not presume that the decision constitutes an admission of fraud. Penn has pointed to no case law supporting such a presumption and my review has revealed none.

Additionally, even if I assume that Reynolds's trial testimony was inconsistent with the testimony he gave in his deposition,[6] such inconsistency does not lead inevitably to the conclusion that he committed fraud on the court. Witnesses testify inconsistently on a fairly regular basis–sometimes intentionally, but more often for completely innocuous reasons such as faulty memory or a misperception of the events at the time they occurred. At this stage, there has

---

[6] To be clear, I offer no opinion at this stage as to whether Reynolds's testimony was inconsistent. Despite Penn's assertion in its brief that I recognized that "Reynolds's complaint is premised on fraud and his discovery and deposition are filled with lies," see Def.'s Br. at 18, I have come to no such conclusion. In our system, judgments involving Reynolds's credibility and the persuasiveness of his evidence are rightly reserved for the jury.

been no evidence presented as to: (1) whether the allegedly altered evidence was in fact altered; (2) whether, and to what extent, Reynolds was involved in making the alterations; and (3) whether Reynolds knew of the alterations at the time of his testimony. Accordingly, I am unable to find by clear and convincing evidence that Reynolds "has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." Aoude, 892 F.2d at 1118. Penn's motion for dismissal based on Reynolds's alleged fraud on the court will be denied.

      2.      The Evidence Presented At Trial Does Not Support JMOL in Favor of Penn

Penn also argues that JMOL is appropriate because the evidence presented at trial did not establish either the existence of an oral contract or breach thereof. I disagree. Viewing the evidence in the light most favorable to Reynolds and giving him the benefit of all reasonable inferences, as I must, I cannot say that there was insufficient evidence for a jury to conclude that Reynolds and Penn had entered a contract and that the contract had subsequently been breached.

In order to prove the existence of an agreement, Reynolds must show that: "(1) both parties manifested an intention to be bound by the terms of the agreement; (2) the terms of the agreement are sufficiently definite to be specifically enforced; and (3) there is mutuality of consideration." Redick v. Kraft, Inc., 745 F. Supp. 296, 300 (E.D. Pa. 1990) (citing Channel Home Ctrs. v. Grossman, 795 F.2d 291, 298-99 (3d Cir. 1986)). The existence of an oral contract must be established by clear and precise evidence. Id. Reynolds argues that he has borne this burden. He points to testimony given by Joel Adler, the person formerly responsible for marketing the EMTM program:

> Q: Dr. Adler, did you ever tell Frank Reynolds that as a – as being a – as being someone who would complete a co-sponsored program between the Wharton School and Penn Engineering, that he could thereafter use any affiliation that would suit him at the moment, whether it was being from Wharton from Engineering or from Penn, or in any combination thereof?
> A: What I communicated was that the certification allowed prospective students to use an affiliation with any one of those institutions. That was its purpose.
> Q: So if a student said, "I'm a Wharton student," no violation, is there?
> A: Well, I think the articulation was after they had gotten their degree from Penn that they were free to use it. The premise was that what is the value of this EMTM degree at the University of Pennsylvania and what affiliations can I establish, and the answer is this certificate permits you to use the affiliation of Wharton, Engineering, and Penn.
> Q: Or individually, depending on what affiliations suited that person at that time, correct?
> A: Or individually.

Transcript of Record, Sept. 30, 2009, Joel Adler at 207-08. Shortly thereafter, in response to questioning by the court, Adler stated:

> Q: . . . The Judge's question was to as to whether you had told Mr. Reynolds that, as to whether you – whether he could use that affiliation in singular or in any combination, Penn, Wharton, Penn Engineering?
> A: I don't recall having that conversation with him.
> Q: Okay.
> A: But I would not have been surprised had I said that.
> Q: Because you told the students that, correct?
> A: Because they had the certificate. That was its purpose.
> Q: And that certainly would be one of the things that would be attractive to someone who would be applying for the program, that they could use those affiliations to whatever benefit they could?
> A: I believe so.
> Q: Including the Wharton?
> A: They could use any of those three affiliations.
> . . .
> Q: Dr. Adler, in promoting the program of EMTM, you routinely advised prospective students that they would be students of all three schools, Wharton, Engineering and Penn, correct?
> A: Correct.
> Q: And in promoting the program of EMTM on behalf of the University of Pennsylvania, you routinely advised prospective students that they would be

11

>considered, upon completion, alumni of all three schools, Wharton, Engineering and Penn, correct?
>
>A: Correct.

Id. at 208-09, 214. A reasonable jury could conclude this conversation amounted to an oral promise by Adler, on behalf of Penn, that: (1) Reynolds would receive a degree that could be represented as a Wharton degree; (2) Reynolds would be a Wharton student with all the rights and privileges available to Wharton students; and (3) Reynolds could describe his affiliation as being with Wharton.

In light of the testimony set forth supra, I am unpersuaded by Penn's argument that any agreement was too imprecise to constitute an enforceable oral contract. Penn quotes a colloquy between Reynolds's counsel and me in support of that proposition:

>The Court: Well, his – he has been, with respect, all that clear about his claim, to my way of thinking, during the course of this trial, because I thought I heard him say that he was entitled to represent himself as having a degree from the Wharton School. And that's why I made this language general, so you two could flesh out in argument, you could state whatever his claims were, and you could rebut him. And that's – I'm just not terribly in my own mind clear of what he is contending. I think he's waffled on whether he was able to represent that he has a degree from Wharton.
>. . .
>The Court: [After hearing Reynolds's counsel's explanation] I take the difference. What I would suggest is you just write up something that you think covers this point, show it to counsel, and then we'll discuss it first thing Monday morning –.
>Mr. Heleniak: Okay
>The Court: . . . Because I'm always afraid I'm going to misstate somebody's contention or defense. And that's why I made this general, so I wouldn't misstate your claims.
>Mr. Heleniak: I will allow Your Honor that that was fairly easy for anybody to do in this case.
>The Court: Yes, so why don't you just write it out – I think I know what you're saying, I suspect once it's written out so the claims are precise, you won't have any difficulty with it, but if you do, I'll hear you on it Monday morning.

Transcript of Record, Oct. 2, 2009 at 103-05. This colloquy occurred during the charge conference, the point of which was to resolve any differences as to how the facts and the law of the case would be described to the jury. The fact that Reynolds's case theory was not susceptible of easy characterization does not mean that the terms of the agreement were imprecise enough to require JMOL in favor of Penn. To the contrary, after hearing Adler's testimony, a reasonable jury could have identified the terms of the oral contract.

Based on testimony by Reynolds both on direct examination and on cross, a reasonable jury could further conclude that Penn had breached the oral contract. For example, Reynolds testified:

> A: I got a letter from the Office of Student Conduct saying I had misrepresented my identity at the University of Pennsylvania, which was absolutely baffling to me. You know, they showed us a letter that we had sent from the Wharton Technology Club, that I wrote, you know, on behalf of the Wharton Technology Club and Wharton, inviting I believe that was CIO Rob Cohen from AstraZeneca to come in and speak and, you know, do what we did the year before. And they were claiming that that letter misrepresented myself as a Wharton student. And I said I am a Wharton student, what are you talking about?
> . . .
> Q: Mr. Reynolds, we discussed the issue of your status as a Wharton student and the challenge that you had to that in the Fall of 2003. Was any issue raised as to your potential status as a Wharton alumnus?
> A: Yes.
> Q: What was that?
> A: We were told that we would not be Wharton alumni.
> . . .
> Q: Was there something about the co-sponsorship where you contend that you did not get what you were expecting?
> A: Well, after the fall of 2003, yes. I could not use the Wharton resources, definitely. We couldn't – I couldn't –
> Q: That's – that's here, right?
> A: That's correct. I was not a Wharton student, I was charged with identifying myself as a Wharton student at the University of Pennsylvania, not allowed to. I was not able to use the resources, and I certainly wasn't going to become an alumni. Yeah.

Transcript of Record, Sept. 30, 2009, Frank Reynolds at 47, 54-55, 87. In light of this testimony, a reasonable jury could have concluded that Penn had breached the contract. Accordingly, having found evidence upon which a reasonable jury could have based its verdict, I will deny Penn's motion for judgment as a matter of law.

B.  A New Trial Is Appropriate Because an Erroneous Evidentiary Ruling Affected the Substantial Rights of Penn

Penn argues, alternatively, that I should grant a new trial because my exclusion of any reference to the Harsh case and the allegedly altered documents was prejudicial error. After Reynolds's counsel represented that he did not intend to rely on the allegedly altered documents to prove his case, I excluded under Rule 403 any reference to those documents and to the Harsh case. Rule 403 allows the court to exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Civ. P. 403. I reasoned that discussion of Harsh's voluntary dismissal of his case with prejudice and costs had little relevance to Reynolds's case. It might, however, reflect poorly on Reynolds and tempt the jury to punish Reynolds for the actions of his colleague. I also reasoned that discussion of the allegedly altered documents would necessarily involve extensive testimony as to whether those documents were altered and whether Reynolds altered them or knew that they had been altered. Such testimony could distract and confuse the jury. Finally, opening the trial to testimony on that issue would extend the length of the trial considerably.

Penn now argues that my ruling was incorrect and rendered the trial "a farce." As discussed <u>supra</u>, in order to grant a new trial, I must decide first whether error was committed. If

14

so, I must determine whether it is highly probable that the error did not affect the objecting party's substantial rights.

> 1. It Was Error To Exclude the Evidence; Its Probative Value Was High and the Accompanying Danger of Unfair Prejudice Was Low

Penn argues that my ruling was erroneous because it prevented Penn from questioning Reynolds on his deposition testimony that Penn considered to be inconsistent with his trial testimony. In Penn's view, "[e]ither most of Reynolds's discovery, or his trial testimony, was untrue, and Penn was prevented from showing it." Def.'s Br. at 13. Penn believes that such inconsistency could have caused the jury to conclude that Reynolds was being untruthful and therefore the probative value of the evidence was high. I agree with Penn. Questions concerning the credibility of any witness–especially one whose credibility could have an important influence on the outcome of the trial–are relevant. Harbor Ins. Co. v. Schnabel Foundation Co., 946 F.2d 930, 935 (D.C. Cir. 1991). The Court of Appeals has emphasized that a jury must have sufficient information to make a discriminating appraisal of a witness's motives and bias. Douglas v. Owens, 50 F.3d 1226, 1230 (3d Cir. 1995). Therefore, the probative value of the excluded evidence–namely, providing information relevant to the jury's determination of Reynolds's credibility–is considerable. In fact, with the benefit of hindsight, I find the probative value of the evidence to be substantially higher than I had realized when I originally ruled on the motion. See United States v. Whitmore, 359 F.3d 609, 619 (D.C. Cir. 2004) (acknowledging that evidence of a witness's inconsistency is highly probative). Trial evidence of the terms of the agreement and breach thereof was obtained primarily through the testimony of Reynolds. At times, his testimony on these points differed from the testimony of other witnesses. In those instances,

when the testimony addressed the essential elements of Reynolds's case, it was especially important for the jury to be able to make a discriminating appraisal of Reynolds's credibility.

On the other hand, the unfairly prejudicial effect of the evidence is low. Although the evidence of Reynolds's alleged inconsistency would harm his case, such harm is insufficient to warrant exclusion under Rule 403. Goodman v. Pennsylvania Turnpike Comm'n, 293 F.3d 655, 670 (3d Cir. 2002) ("[P]rejudice does not simply mean damage to the opponent's cause."). Instead, "the . . . prejudice against which the law guards [is] . . . unfair prejudice . . . prejudice of the sort which cloud[s] impartial scrutiny and reasoned evaluation of the facts, which inhibit[s] neutral application of principles of law to the facts as found." Id. (quoting Wagenmann v. Adams, 829 F.2d 196, 217 (1st Cir. 1987)). The Court of Appeals has also held that evidence may properly be excluded where "its admission would lead to litigation of collateral issues, thereby creating a side issue which might distract the jury from the main issue." Blancha v. Raymark Indus., 972 F.2d 507, 516 (3d Cir. 1992) (citing United States v. Dennis, 625 F.2d 782, 797 (8th Cir. 1980)). My original ruling was based in part on those grounds. Upon reconsideration, I find that the introduction of the allegedly altered documents would not create a side issue. Instead, that evidence is directly relevant to the jury's determination of Reynolds's credibility, which is in no way collateral to the overall issue of liability.

In sum, I cannot say that the probative value of the evidence pertaining to the allegedly altered PowerPoint and emails is substantially outweighed by the danger of unfair prejudice. I erred in excluding reference to that evidence.[7]

---

[7] Additionally, I erred in not allowing Penn sufficient opportunity to argue its opposition to Reynolds's motion. Because the motion was filed the day before trial, Penn was only able to file a letter brief in support of its position. The motion was then informally argued

2.      The Erroneous Ruling Prejudiced Penn

I must next determine whether it is highly probable that the error did not affect the objecting party's substantial rights. I find that the error affected Penn's substantial rights. In a case like this one, where the foundation of Reynolds's case is his own testimony, his credibility is of paramount importance. Penn was therefore entitled to probe for weaknesses. I note that for this evidence to be relevant there need not be a finding that Reynolds altered the evidence himself or even knew that it had been altered. Instead, the mere fact that he claimed at his deposition to rely on certain documents and statements in support of his case and then relied at trial on a largely different group of documents and statements is enough to render them probative of Reynolds's credibility. Furthermore, Penn may prove that the documents were altered even if Reynolds neither altered them himself nor knew they had been altered.

Because I find that it was error to exclude the allegedly altered evidence and that such error affected the substantial rights of Penn, I will grant the motion for a new trial.[8]

CONCLUSION

In light of the foregoing, I will deny Penn's motion for JMOL and grant its motion for new trial. A new trial is warranted because my erroneous evidentiary ruling affected the

---

in chambers on the morning of trial, but Penn was not given a full and fair opportunity to point out the consequences of excluding the evidence.

One of the results of this limited argument was that defendant's counsel did not call my attention to my September 15, 2008 ruling, which I had forgotten about, wherein I had decided that whether Reynolds had fabricated evidence would be a question of fact for the jury. Consequently, I ruled inconsistently.

[8]    In light of this ruling, I have no need to consider Penn's additional arguments that a new trial is warranted because: (1) the jury's damage award did not make sense and was the result of passion and/or prejudice; and (2) Reynolds referred to evidence at trial that had been excluded.

substantial rights of Penn. At the new trial, the evidence of the allegedly altered documents will be admissible.

An appropriate Order follows.