IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANK REYNOLDS | : | CIVIL ACTION |
| | : | NO. 06-1237 |
| v. | : | |
| | : | |
| THE UNIVERSITY OF PENNSYLVANIA | : | |
| | : | |
| O'NEILL, J. | | JUNE 2, 2010 |

## MEMORANDUM

In preparation for a retrial of the above captioned matter, each party has filed one motion in limine. Presently before me are both motions and responses to each.[1] For the following reasons I will deny Reynolds's motion and grant the University of Pennsylvania's motion.

## BACKGROUND

The factual background underlying this lawsuit is set forth at length in my January 27, 2010 Memorandum wherein I granted Penn's motion for a new trial. In essence, Reynolds claims that Penn made several misrepresentations about the nature of the Executive Masters in Technology Management degree he was to receive. During the discovery period prior to the first trial, Reynolds contended that such misrepresentations were contained in a variety of marketing materials, slide show presentations and webpages. Penn argued that the documents on which Reynolds allegedly relied were altered in several material respects. On the eve of trial, Reynolds moved to exclude any reference to those documents. I granted Reynolds's motion over Penn's objection. After the trial concluded, I decided that my ruling was incorrect and thus granted Penn's motion for a new trial.

---

[1] Reynolds has not filed a response to Penn's motion. I assume he rests on the brief filed in opposition to a similar motion by Penn in advance of the first trial.

DISCUSSION

I.      Reynolds's Motion to Exclude Evidence Will Be Denied

Reynolds moves to exclude forty-seven of Penn's exhibits as irrelevant or, alternatively, as more prejudicial than probative. The motion is largely identical to that which he filed in advance of the first trial. Penn argues that the documents are relevant and admissible. I will discuss each argument in turn.

      A.      Reynolds's Motion To Exclude Evidence as Irrelevant

The forty-seven documents that he seeks to exclude are those that Penn alleges Reynolds altered in order to support his claim that Penn misrepresented the nature of the EMTM program. Rule 401 of the Federal Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Reynolds argues that each of these exhibits relates only to the companion case filed by Anurag Harsh and is thus irrelevant.[2] Penn argues that each of the documents is relevant either to attack Reynolds's credibility or to show that there was no meeting of the minds between the parties. I agree with Penn.

Penn helpfully divides the forty-seven contested documents into three categories: (1) those that were altered; (2) those that prove the documents were altered; and (3) those that relate exclusively to Harsh and Harsh's lawsuit. Def.'s Br. at 2. The first two categories are, as Penn suggests, relevant for the two reasons set forth in my January 27, 2010 Memorandum. First, they

---

[2] Harsh filed a companion case alleging the same misrepresentations by Penn. The cases proceeded along parallel schedules but were never formally consolidated. On September 15, 2008, I granted Harsh's motion to dismiss his lawsuit voluntary.

bear directly on Reynolds's credibility. "Questions concerning the credibility of any witness–especially one whose credibility could have an important influence on the outcome of the trial–are relevant." See Reynolds, 684 F. Supp. 2d 621, 632 (E.D. Pa. 2010) (citing Harbor Ins. Co. v. Schnabel Foundation Co., 946 F.2d 930, 935 (D.C. Cir. 1991)). If it is true that Reynolds claimed during discovery to have relied on certain documents and later, at trial, claimed to rely on a different set of documents, a jury could reasonably question his credibility. Certainly, if the evidence shows that he altered those documents to strengthen his case or even knew that they were altered, a jury could conclude that his testimony is entitled to little weight.

Second, even if the documents were altered through no wrongdoing of Reynolds, Harsh or anyone else associated with this case, they might still be relevant. In the event that Reynolds was shown documents that neither he nor Penn knew to be inaccurate but were in fact materially inaccurate, such documents might be relevant to demonstrate that there was no "meeting of the minds" as is required to prove breach of contract. See Benchmark Group, Inc. v. Penn Tank Lines, Inc., 612 F. Supp. 2d 562, 581 n. 10 (E.D. Pa. 2009) (citing Brisbin v. Superior Valve Co., 398 F.3d 279, 293 (3d Cir. 2005) (noting that a legally binding contract requires a meeting of the minds)). The documents in the first category–those that were altered–are relevant and admissible.

Because the altered documents are relevant, the second category of documents–those that establish the alterations–are also relevant. Penn intends to present four such exhibits. Three arguably establish that the Wharton logo contained in the documents Reynolds claims to have relied on was not used by the University until after Reynolds claims to have seen the documents. The fourth exhibit shows that the version of Adobe software used to prepare the allegedly altered

3

documents did not exist at the time Reynolds claims to have seen the documents. Each of these exhibits is relevant to show that the documents Reynolds claimed to rely on were altered.

The third category of exhibits–those relating to Harsh and his lawsuit–is not susceptible of a categorical pre-trial ruling. The relevance of most of the documents in this category will depend on what evidence Reynolds presents at trial. If, for example, he argues that the documents were altered by Harsh, then Harsh's testimony and the exhibits documenting Harsh's actions might be relevant. Penn will be granted enough leeway in this area to explore through Harsh the truth of Reynolds's trial testimony and to establish, if possible, that the documents were indeed altered. I will reserve ruling on the admissibility of individual exhibits and the scope of Harsh's testimony, however, until trial.

B.  Reynolds's Motion to Exclude Evidence Pursuant to Rule 403

Reynolds also argues that even if the documents and testimony in question are relevant, they should nonetheless be precluded because they are substantially more prejudicial than probative. His argument is based on the proposition that the jury might improperly punish Reynolds for the misdeeds of Harsh. I disagree.

I find the probative value of such evidence to be high and the likelihood of unfair prejudice to be slim. As discussed more fully <u>supra</u>, the evidence is probative because it will allow the jury to make a discriminating appraisal of Reynolds's credibility and to determine whether there was a meeting of the minds between Reynolds and Penn. With respect to the possibility of unfair prejudice, Reynolds argues that the jury might be tempted to "improperly paint[ ] Reynolds with Harsh's alleged misconduct and alleged bad character." Pl.'s Br. at 7. I find that this possibility of unfair prejudice is insufficient to outweigh the probative value of the

evidence. Our legal system often relies on juries to assign responsibility for certain actions. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Spain v. Gallegos, 26 F.3d 439, 453 (3d Cir. 1994). I have no reason to believe that this case requires extraordinary measures. As the Court of Appeals has recognized, "[t]he jury is intelligent enough, aided by counsel, to ignore what is unhelpful in its deliberations." In re Japanese Elec. Prods. Antitrust Litig., 723 F.2d 238, 279 (3d Cir. 1983) (quoting 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702(03), at 702-14-15). I will deny plaintiff's request to exclude the evidence under Rule 403.

    C.    Conclusion

For the reasons discussed supra, I will deny Reynolds's motion to exclude the altered documents (category 1) and the evidence that proves the documents were altered (category 2). I will reserve ruling on his motion to exclude exhibits relating solely to Harsh. I will also deny his motion to exclude all three categories of evidence under Rule 403.

II.    Penn's Motion To Exclude Subsequent Remedial Measures Will Be Granted

Penn moves to exclude evidence of: (1) alterations to Penn's website; (2) the November 1, 2003 townhall meeting; and (3) any statements made therein. It argues that all three were subsequent remedial measures that should be excluded under Rule 407 of the Federal Rules of Evidence. Reynolds argues that the website content and the townhall meeting were merely admissions of liability and were in no way remedial. I agree with Penn and will grant the motion to exclude the evidence.

A.  Legal Precepts

Rule 407 provides:

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

The primary purpose of Rule 407 is to encourage individuals "to take, or at least not to discourage individuals from taking, steps in furtherance of added safety." See Fed. R. Evid. 407, Advisory Comm.'s Note; see also Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 415 (3d Cir. 2002) ("Rule 407 rests on the strong public policy of encouraging manufacturers to make improvements for greater safety.") (internal quotations omitted).

B.  The Changes to the Website Were Subsequent Remedial Measures

In approximately January of 2004, following questions raised by Reynolds and his classmates over the nature of the EMTM program and their status as Wharton students, Penn revised its website to clarify that the EMTM program was cosponsored by the Wharton school and that EMTM students were "'honorary' members of the Wharton alumni network and online community." Exh. P-2 at 7. Penn argues that such revisions should be excluded from evidence as subsequent remedial measures. Reynolds's brief does not address the issue.

I find that the website revisions are subsequent remedial measures and therefore must be excluded from evidence.³ The revisions clarified the program description that Reynolds argued

---

³  Subject, of course, to a showing that the evidence is being offered for one of the admissible purposes listed in Rule 407.

was misleading. If such revisions had been made prior to Reynolds's enrollment in the program, there would be little question as to the nature of the degree he would receive. He would thus have been less likely to suffer the harm he alleges. The requirements of Rule 407 are satisfied.

Excluding the website revisions from evidence also furthers the public policy underlying Rule 407. In the face of questions about the nature of the EMTM program, Penn should be encouraged to provide necessary clarifications. Otherwise, additional prospective students may suffer harm similar to that alleged by Reynolds. If Penn feared that such clarifications could later be characterized as an admission that the original website misrepresented the program, it might be disinclined to make the necessary changes. See Probus v. K-Mart, Inc., 794 F.2d 1207, 1210 (7th Cir. 1986) ( "The purpose of Rule 407 is to promote safety by removing the disincentive to take post-accident safety measures that would exist if the accident victim could introduce evidence of these measures on the issue of the defendant's liability."). Excluding the evidence eliminates that fear and incentivizes corrective action, which is exactly what the drafters of Rule 407 intended.

    C.    The Townhall Meeting and the Statements Made Therein Were Subsequent Remedial Measures

Penn also moves to exclude a DVD recording of the November 1, 2003 townhall meeting that was held to address EMTM student concerns over the nature of the program and its relationship to the Wharton School. Reynolds argues that the townhall meeting was not sufficiently remedial to qualify for exclusion under Rule 407. I disagree.

1.  The Townhall Meeting Itself Was a Subsequent Remedial Measure

My review of the parties' submissions reveals that the meeting was a remedial measure. During the meeting, the EMTM students in attendance were informed by several Penn administrators that they were students in the engineering school and that they would receive an engineering degree. They were further informed that although the EMTM program was co-sponsored by Wharton, they were not technically students of Wharton. If this meeting had been held prior to Reynolds's enrollment in the EMTM program, the likelihood that he would have been confused about the nature of the program would have been greatly reduced. In essence, the meeting served the same purpose as the revisions to the website–to provide clarification to prospective and enrolled students about the nature of the EMTM program. It was thus sufficiently remedial to fall within the protections of Rule 407.

2.  The Statements Made During the Meeting Were Subsequent Remedial Measures

Reynolds attempts to avoid this conclusion by separating several of the statements made by Penn administrators during the meeting from the meeting itself. For example, he notes that Lyle Ungar stated that "[t]he marketing has–I looked, and the marketing hasn't violated that and there's occasionally been mistakes made from within–that's my standard for the marketing material. (Inaudible) some of them to my horror only mention Wharton, which I think is, you know, unforgiveable." Pl.'s Br. at 3. Reynolds argues that this statement should not be excluded because it is not remedial.

a. Third Circuit Court of Appeals Precedent

The question, then, is whether the statements made by Penn administrators for an arguably non-remedial purpose fall within the ambit of Rule 407. The Court of Appeals addressed this issue in <u>Complaint of Consolidation Coal Co.</u>, 123 F.3d 126, 136 & n. 9 (3d Cir. 1997). There, the plaintiff was injured when he fell while working on a barge owned by the defendant. <u>See id.</u> at 130-31. In order to decide liability, the District Court needed to determine whether the "leaving line" that the plaintiff was handling at the time of his injury broke and thereby caused the plaintiff's fall, or whether the plaintiff fell of his own accord and the line was cut after the accident. <u>See id.</u> at 136. The District Court decided that the plaintiff's own negligence was to blame for the fall and that the leaving line was cut after the accident. <u>See id.</u> at 135-36.

On appeal, the plaintiff argued that the District Court erred in excluding pursuant to Rule 407 a report filed five days after the accident because in addition to remedial measures that report also contained a discussion of the post-accident investigation. <u>See id.</u> at 136. The remedial component of the report "stated that an employee fell after a leaving line broke and cautioned all employees to inspect ropes carefully before using them." <u>See id.</u> The authors of the report also noted, however, that "[the] investigation showed that the line had suffered prior damage and although it was the normal 1-1/2 [inch] MPO leaving line typically used for this purpose, a close inspection should have pointed out the damage and the line should have been taken out of service." <u>See id.</u> at 138 (McKee, J., dissenting). Despite the fact that the plaintiff only sought to admit the investigation results, the District Court excluded the entire report as a subsequent remedial measure. <u>See id.</u> at 136. The Court of Appeals affirmed, holding that "there is

9

authority supporting the exclusion of evidence of post-accident investigations under Rule 407." See id. (rejecting the dissent's argument that the report was not a subsequent remedial measure) (citing Specht v. Jensen, 863 F.2d 700, 701-02 (10th Cir. 1997); Alimenta v. Stauffer, 598 F. Supp. 934, 940 (N.D. Ga. 1984)).

The present case is similar. Like the post-accident investigation report in Consolidation Coal, the townhall meeting–which was, in itself, a subsequent remedial measure–contained both remedial measures and at least one admission. Like the plaintiff in Consolidation Coal, Reynolds requests that I parse out those statements that were not strictly remedial and allow them to be admitted to the jury. I will not do so.

The Court's holding in Consolidation Coal, which is binding on me, clearly allows non-remedial statements in an otherwise remedial measure to be excluded under Rule 407. See id. at 136. Indeed, Consolidation Coal presented an even stronger case for admission because, unlike here, the plaintiff only requested that the non-remedial component of the report be admitted. See id. (". . . [the plaintiff] only sought to admit the portion dealing with Consol's investigation of the accident . . . ."). If, under such circumstances, Rule 407 precluded the admission of the investigation report, it must also exclude the very few statements made in the townhall meeting that were not remedial in nature.

    b.  Persuasive Authority in Support

A review of the case law from other Circuits reveals that my holding comports with the holdings of other Courts that have considered similar issues. First, in Rutledge v. Harley-Davidson Motor Co., No 4:08-65, 2009 WL 1635762, at *3 n.1 (S.D. Miss. June 10, 2009), the plaintiff alleged that the motorcycle she bought from the defendant contained design and

10

manufacturing defects that caused her to crash. See Rutledge, 2009 WL 1635762, at *2. In order to establish such defects, the plaintiff relied on a recall notice issued by the defendant that contained the statement "[the relevant motorcycle was] built with voltage regulator part number 74546-07 which, as a result of a greater body thickness than used in previous model years, may contact the front fender under certain conditions." See id. Although this statement was not strictly remedial, the District Court excluded it under Rule 407 because it was part of a voluntary recall, which "is the sort of behavior that Rule 407 is intended to encourage." See id. at *3 n.1.

Maddox v. City of Los Angeles, 792 F.2d 1408, 1417 (9th Cir. 1986), presents a similar situation. There, the plaintiff alleged, inter alia, that a police officer employed by the City of Los Angeles had used an illegal choke hold on the decedent that resulted in his death. See Maddox, 792 F.2d at 1411. Following the incident, the police department conducted a disciplinary proceeding at which the officer admitted to applying to the decedent a choke hold that was prohibited by city policy. See id. at 1417. The District Court excluded the evidence pursuant to Rule 407, reasoning that the disciplinary proceeding as a whole was a remedial measure. See id. The Court of Appeals for the Ninth Circuit affirmed. See id.

Finally, in Specht v. Jensen, 863 F.2d 700, 701 (10th Cir. 1988), the plaintiffs alleged that the Steamboat Springs police had illegally searched their home and office. See Specht, 863 F.2d at 701. Following the search, the City of Steamboat Springs issued a press release that "summarize[d] the results of the City's investigation of the incidents giving rise to the lawsuit." See id. "The release state[d] that the officers involved exercised poor judgment in failing to read the writ of assistance thoroughly, and that appropriate disciplinary action would be taken." Id. The District Court excluded the press release pursuant to Rule 407 and the Court of Appeals for

11

the Tenth Circuit affirmed, finding that "the release . . . sets out remedial measures taken by the City to prevent the recurrence of the poor judgment the investigation revealed, and is therefore within the ambit of Rule 407." See id.

Each of these cases supports the proposition that Rule 407 permits the exclusion of non-remedial statements contained in an otherwise remedial measure.

   c. A Countervailing View

On the other hand, Judge McKee, dissenting in Consolidation Coal, found Rocky Mountain Helicopters, Inc. v. Bell Helicopters Textron, 805 F.2d 907, 918 (10th Cir. 1986), to be persuasive. There, the Tenth Circuit held that a report commissioned by the defendant in the wake of a helicopter accident was not a subsequent remedial measure.

> It would strain the spirit of the remedial measure prohibition in Rule 407 to extend its shield to evidence contained in post-event tests or reports. It might be possible in rare situations to characterize such reports as "measures" which, if conducted previously, would reduce the likelihood of the occurrence. Yet it is usually sounder to recognize that such tests are conducted for the purpose of investigating the occurrence to discover what might have gone wrong or right. Remedial measures are those actions taken to remedy any flaws or failures indicated by the test. In this case, the remedial measure was not the Photoelastic Study of the trunnion but rather the subsequent redesign of the trunnion. As noted above, references to redesign were excluded at trial.

Id. at 918.

The present case is distinguishable. Unlike in Rocky Mountain Helicopters, where it appears the study only identified the problem but did not suggest a remedy, here the townhall meeting was held primarily for remedial purposes–to clear up confusion over the nature of the EMTM program. To the extent that the source of the confusion was discussed at the meeting,

12

such disussion was merely the inevitable byproduct of the primarily remedial function of the meeting. Because the town hall meeting served a primarily remedial function, Rocky Mountain Helicopters is inapposite.[4]

D. Conclusion

For the reasons discussed infra, the changes to the website, the townhall meeting and the statements made therein are all subsequent remedial measures. I will therefore preclude any reference to such measures at trial except for the allowable purposes outlined in Rule 407.[5]

An appropriate Order follows.

---

[4] Indeed, the Court of Appeals drew exactly this distinction in a footnote to Consolidation Coal. See Consolidation Coal, 123 F.3d at 136 n. 9 ("Rocky Mountain dealt with tests and reports designed specifically to determine the nature of a problem, though, while the memo in question here was a 'safety alert,' [which] was designed to alert Consol employees to a potential danger, worn lines, and advise them of measures to avoid this danger, closer inspection.").

[5] Reynolds's argument that the statements made in the townhall meeting are admissible for impeachment purposes is plausible. I will reserve ruling on that argument, however, until the evidence is presented at trial.