IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK REYNOLDS                :       CIVIL ACTION
                                        :       NO. 06-1237
         v.                       :
                                          :
THE UNIVERSITY OF PENNSYLVANIA   :

O'NEILL, J.                                   OCTOBER 25, 2010

## MEMORANDUM

Reynolds alleged that Penn breached its contract with him or, alternatively, that Penn had been unjustly enriched. At the conclusion of a six day trial, the jury found that Penn had been unjustly enriched and awarded Reynolds $66,000. Both parties filed post trial motions. Reynolds argues that I erroneously excluded evidence at trial and therefore a new trial is warranted. Penn argues that for several reasons it is entitled to judgment as a matter of law ("JMOL"). The motions are fully briefed and presently ripe for disposition.[1] For the following reasons, I will deny Reynolds's motion for a new trial and grant Penn's motion for JMOL.

## BACKGROUND

Reynolds was a student in Penn's Executive Masters in Technology Management program. He alleges that Penn promised that upon his completion of the program Reynolds would be entitled to certain benefits. He further alleges that he never received such benefits. As a result, Reynolds filed this lawsuit.

---

[1] Presently before me are Penn's motion for JMOL and its brief in support thereof (Doc. No. 159); Reynolds's response in opposition (Doc. No. 165); and Penn's reply (Doc. No 168). Also before me are Reynolds's motion for a new trial (Doc. No. 145); his brief in support thereof (Doc. No. 167); Penn's response in opposition (Doc. No. 158); and its brief in support thereof (Doc. No. 166).

Prior to his enrollment in the EMTM program, Reynolds was a marketing executive at the Xerox Corporation. Trial Tr. 58:1-10, Reynolds Test. (June 15, 2010). At the same time, he also served as President and CEO of Expand the Knowledge, a not-for-profit company that he had co-founded. Id. at 40:15-25. He testified that he logged approximately 110 hours of work per week between the two jobs. Id. at 40:15-16.

Reynolds first learned about the EMTM program from an advertisement in an in-flight magazine he reviewed while traveling. Id. at 40:10-12. At that time, Reynolds held four degrees: a Bachelor of Science degree in Marketing from Rider University; a Master of Science degree in Psychology from Chestnut Hill College; a Master of Science degree in E-Business from Temple University and a Master of Business Administration degree in Health Administration from Saint Joseph's University. See Reynolds's App. for Admission to Graduate Studies, Part I (Pl.'s Ex. 7). He testified that the presence of a Wharton logo initially attracted him to the advertisement. Trial Tr. 41:18-19, Reynolds Test. (June 15, 2010). He believed that he did not need additional education but would benefit from associating himself with what he referred to as "the Wharton brand." Id. at 42:10-19. Upon concluding his travels, he visited the Wharton website to find out more about the EMTM program. Id. at 43:14-23. While there, he claimed to have limited his research to the section of the website setting forth the EMTM program's alumni benefits. Id. at 46:12-19 ("Q. Now was there some particular reason that you focused on or read the alumni benefits? A [by Reynolds]. It was the only thing I was interested in."). That section promised EMTM applicants that, upon graduation from the program, they would be entitled to

> the full advantages of being Penn Engineering alumni, Wharton alumni and Penn Alumni. Perhaps the most significant benefit is the opportunity to join the alumni network and the most

important tools to enable that network are the alumni directories. There are actually 2 alumni directories. The Penn alumni directory is available to all graduates of the University. The only school that provides a distinct alumni network is Wharton, in which you are included as an EMTM graduate. If you have not already done so, register on-line and confirm that your information is up-to-date in both directories. The Wharton directory is part of WAVE (Wharton Alumni Virtual Experience) at http://www.wave.wharton.upenn.edu/. You can search for other EMTMers in this directory by searching for cohort =X. The Penn directory uses the same technology, but they are different databases and contain different data. So be sure to also register and confirm your information for this larger and broader network by visiting www.alumniconnections.com/olc/pub/UPN. While Penn Engineering does not provide a distinct directory, the EMTM office does want to maintain close ties with our alumni. So please be sure to share your most up-to-date contact information with them at EMTM@seas.upenn.edu or 215-898-5241.

In addition to alumni directories, you have access to 2 separate lifelong e-mail addresses, an unchanging e-mail address that you can use throughout your lifetime. Once you have a lifelong e-mail address, you can update the address for incoming mail to be forwarded. The standard address formats are firstname.lastname.class@wharton.upenn.edu and firstname.lastname@alumni.upenn.edu. The "class" used in your Wharton address is Wtyy; WT stands for Wharton Technology, and yy is the year of your graduation. You establish your lifelong e-mails at WAVE and alumniconnections, respectively.

EMTM Website,[2] Alumni Benefits (Pl.'s Ex. 5); <u>see also</u> Trial Tr. 49:13-50:1, Reynolds Test.

(June 15, 2010) (discussing alumni benefits section of EMTM website).

Reynolds next telephoned Joel Adler, then-associate director of the EMTM program, in

an attempt to learn more about the program. Trial Tr. 46:14-16, Reynolds Test. (June 15, 2010).

Adler invited Reynolds to attend an informational session directed toward prospective students.

---

[2] Plaintiff's exhibit 5 does not contain a URL address. Plaintiff testified, however, that he accessed the website by means of a link on the Wharton website. Trial Tr. 46:3-6 (June 15, 2010).

Id. at 52:10-12.  At the informational session, Adler gave a PowerPoint[3] presentation on the benefits of the EMTM program.  Id. at 61:6-8.  Although paper copies of the presentation were distributed before Adler spoke, Reynolds testified that he did not receive a copy because they had run out by the time he arrived.  Id. at 52:11-16.  He also testified that he was unable to see the PowerPoint presentation from where he was sitting because a spinal cord injury prevented him from turning his head in the direction of the presentation.  Id. at 61:9-17.  Reynolds later received both a paper copy and an electronic copy of the PowerPoint presentation but he testified that he never looked at either version.  Id. at 61:20-62:8.  Reynolds testified that at the informational session Adler informed the audience that EMTM alumni have "full access to all Wharton resources."  Id. at 53:3-4.  However, Reynolds stated that he was "shocked" to learn at that session that the degree conferred upon EMTM graduates was a Master of Science in Engineering not a "Wharton degree" as he expected.  Id. at 53:4-6.

After the informational session, Reynolds questioned Adler at length about why the degree was issued through the School of Engineering.  Id. at 53:12-13.  According to Reynolds, Adler explained to him that due to "turf wars" at Penn, "Wharton had to partner with [E]ngineering in order to issue the degree."  Id. at 53:17-24.  Adler clarified, however, that EMTM graduates receive three documents: (1) a degree issued by the University; (2) "a document signed by both deans of Wharton and Penn Engineering"; and (3) "a Moore Certificate [which represents] the engineering school's contribution to the program."  Id. at 54:1-9. Reynolds testified that he expected to receive each of the three documents.  Id. at 54:9-12.

---

[3]     The slides were designed with PowerPoint software and then printed onto acetate slides.  The parties refer to the slides as a PowerPoint presentation.  I will do the same.

Reynolds, who was primarily concerned with benefitting from the Wharton brand, asked Adler how he could represent his status with respect to Wharton. Id. at 54:12-14. Reynolds testified that Adler told him "it depends on who you're talking to . . . you can use it any way you want . . . . if you're with engineers, you can talk about your Master's of Science in Engineering, and if you're with business people, you can talk about your Master's of Technology Management from the Wharton School." Id. at 54:14-19. Reynolds recalled that Adler, who had a Ph.D. in computer science from Wharton, told him "I'm a Wharton alumni [and] you're going to be equal to me." Id. at 55:21-23.

After considering all the information available to him, Reynolds decided to apply for admission to the EMTM program. Id. at 56:13-14. He addressed his application to "EMTM, Graduate Admissions Office, Penn Engineering." Id. at 58:25-59:11. In July 2002, Reynolds was accepted into the program. See Email from Reynolds to Adler (July 25, 2002, 5:50:01 A.M.) (Pl.'s Ex. 9).

He began his EMTM studies in August 2002. Trial Tr. 65:10-11, Reynolds (June 15, 2010). He testified that at first his experience "was good, we were able to use all the Wharton resources, I was a Wharton student, I was proud, I was showing up [] every other week." Id. at 65:20-22. In his first week in the EMTM program, with the help of Wharton's career services department, Reynolds was hired by the Siemens Corporation as the Director of Global Business Development. Id. at 66:1-3. In his new role, Reynolds was "responsible for 132 countries" and reported directly to the CEO, George Nolan. Id. at 66:1-6. By his own account, Reynolds was "the Wharton guy" at Siemens. Id. at 93:7. According to Reynolds, "everybody called [George Nolan] my godfather," id. at 94:24, and he was one of eight people "in the high potential

candidate pool to be the next CEO." Id. at 93:1-2.  He earned as much as $269,000 at Siemens.

Id. at 102:3-5.  Reynolds testified that as a result of his new job, he was "absolutely thrilled . . .

really on top of the world."  Id. at 66:8-9.  Indeed, Reynolds acknowledged that "this [was]

exactly what I was paying for at Wharton[.]"  Id. at 66:7-9.

Despite his newfound professional success, Reynolds claimed that he was immediately

dissatisfied with the education he was receiving in the EMTM program.  Id. at 66:22-67:3.

Eighteen of his twenty-one professors were adjuncts–a category of professors that Reynolds

characterized as "hired guns."  Id. at 66:16-22.  In addition, Reynolds described the EMTM

courses as "half courses" which required only eighteen hours of instruction as opposed to the

thirty-six to forty-five hours required by "full Wharton courses."  Id. at 67:6-9.  Nevertheless,

Reynolds successfully completed his first year of studies.  Id. at 68:21-23.

It was not until the Autumn of 2003, the beginning of Reynolds's second year, that

"everything went haywire."  Id. at 69:5.  By Reynolds's account, students were "outraged" over

the fact that Penn had hired a new co-director of the EMTM program, Ziv Katalan, who allegedly

intended to "eliminate [the] Wharton brand."  Id. at 69:7 - 70:3.  Reynolds's first disagreement

with the new administration occurred while he was helping a student society organize a seminar

series.  When he attempted to reserve a room in Jon M. Huntsman Hall, a Wharton School

building, he was told that he was not a Wharton student and therefore could not reserve a room in

Huntsman Hall.  Id. at 73:5-11.  Because he had worked on a similar project during his first year

in the program and had no trouble reserving a room, id. at 73:5-6, he called the EMTM program

to find out why the policy had changed.  Id. at 74:21-23.  He was told that Katalan had forbidden

EMTM students from reserving rooms in Wharton School buildings.  Id. at 74:24-25.

The inability to reserve a room in Huntman Hall did not prevent Reynolds from going forward with the speaker series. On September 9, 2003, he invited Robert Cohen, Chief Information Officer of AstraZeneca, to speak at the seminar series. See Letter from Reynolds to Robert Cohen, Chief Information Officer, AstraZeneca (Sep. 9, 2003) (Def.'s Ex. 79). That letter was sent on Wharton letterhead and purported to extend the invitation "[o]n behalf of the Wharton School of Business." Id. Reynolds, along with his EMTM classmate Anurag Harsh, also circulated a flier on Wharton letterhead advertising a presentation given by John C. Carrow, Chief Information Officer of the Unisys Corporation. See Wharton Technology Club Executive Seminar Series Advertisement (Def.'s Ex. 81 at 18). The flier indicated that the presentation was sponsored by Siemens and supported by the Wharton Technology Club.[4] See id. Reynolds claimed that he had received permission from the Wharton Corporation to publicize these events as being sponsored by the Wharton School. Trial Tr. 80:12-14, Reynolds Test. (June 15, 2010). Katalan testified, however, that invitations of this sort were never extended by student organizations or individual students. Trial Tr. 31:21-23, Katalan Test. (June 17, 2010). Instead, the Dean of the Wharton School and Vice Dean of the Graduate Division ordinarily invited speakers to Wharton School seminars. Id. at 31:21-23.

---

[4]     Reynolds testified that "[a]ll the leadership of the Wharton Technology Club were over-the-top enthusiastic about our seminar series . . . ." Trial Tr. 80:12-14, Reynolds Test. (June 15, 2010). Katalan, on the other hand, testified that "[t]he [Wharton Technology Club] president and officers disassociated themselves from this series and said that they never gave permission to Frank Reynolds and others to use their club logo and name." Trial Tr. 26:17-19, Katalan Test. (June 17, 2010). Emails from Joseph Chong, Wharton Technology Club president, to Katalan lend support to Katalan's testimony. See Def.'s Ex. 81 at 2 (complaining of aggressive behavior by Reynolds and Harsh and stating "I think we just want the frequent inquiries and aggressive behavior to stop so we can continue to focus on executing our initiatives for the year" and "I started off excited by the opportunity to work with [Reynolds and Harsh] but at this point I am completely flabbergasted by the time and effort required merely to stave them off.").

As a result of these publications, Katalan became concerned that Reynolds and Harsh were misrepresenting themselves as Wharton students and, worse, were purporting to act on behalf of the Wharton School.  Id. at 26:11-23.  So Katalan scheduled a meeting at a local Starbucks with Reynolds and Harsh to discuss his concerns.  Trial Tr. 22:13-14, Reynolds Test. (June 16, 2010); 57:6-14, Katalan Test. (June 17, 2010).  Reynolds testified that Katalan told those in attendance that they were not Wharton students.  Trial Tr. 83:6-8, Reynolds Test. (June 15, 2010).  Reynolds also asserted that Katalan "basically attacked us . . . smashing a book on our table . . . [spilling] coffee all over us, flipping out on us . . . ."  Id. at 82:9-12.  Katalan denied discussing in any manner the students' affiliation with the Wharton School and he further denied raising his voice, slamming a book or causing coffee to spill.  Trial Tr. 64:22-65:2, Katalan Test. (June 17, 2010).

Following the meeting, Reynolds wrote to Judith Rodin, the President of the University of Pennsylvania, "to seek protection . . . from what has become a witch-hunt against me and conducted by Ziv Katalan Ph.D."  See Letter from Reynolds to Rodin (Sep. 29, 2003) (Def.'s Ex. 88).  Notably, Reynolds recited several of Katalan's "intolerable actions" but did not include allegations that Katalan slammed a book or spilled coffee.  See id.  He also did not allege in his letter to Rodin that Katalan told those in attendance that they were not Wharton students.  See id.; but see Trial Tr. 83:6-8, Reynolds Test. (June 15, 2010) (Reynolds testified: "[y]eah, [Katalan] said we were not Wharton students . . . .").

Katalan's actions lead to a "flurr[y] of surveys," presumably by student organizations, asking if EMTM students believed themselves to be Wharton students.  Id. at 75:10-13. Katalan's own survey lead to yet another altercation between Reynolds and Penn's

administration.  Id. at 77:17-25.  Reynolds believed that Katalan's survey contained a flaw that prevented the software from recording votes in favor of the answer Reynolds preferred.  Id. at 77:21-23.  So he voted multiple times.  Id. at 78:3-6.  This prompted Penn's Office of Student Conduct to initiate disciplinary proceedings against Reynolds for violating the Code of Student Conduct–which Reynolds described at trial as "some kind of stupid code"–by voting multiple times in the survey and by representing himself to be a Wharton student.  See Letter from Michelle Goldfarb, Director of the Office of Student Conduct, to Reynolds (Oct. 15, 2003) (Pl.'s Ex. 22); see also Trial Tr. 78:14, 81:23-25, Reynolds Test. (June 15, 2010).  Reynolds, apparently unimpressed by Penn's disciplinary efforts, described the proceedings as "petty" and "pathetic."  Trial Tr. 78:15, Reynolds (June 15, 2010).  From the witness stand at trial, Reynolds reprimanded the Penn administrators in attendance: "I mean, you guys should all be embarrassed."  Id. at 82:1.

On November 1, 2003, Penn administration scheduled a town hall meeting.  The purpose of the meeting was to clarify the nature of the EMTM program's affiliation with the Wharton School.  See Townhall Meeting Tr. at 7-8 (Nov. 1, 2003).[5]  At that meeting Anjani Jain, Dean of the Wharton School, informed the audience that "you are students in the engineering school . . . . The admissions are done [in] engineering.  You go to commencement from Penn Engineering, and the degree you get is an engineering degree."  Id. at 8.  Jain also stated "I think for all intents and purposes your access to our alumni services is indistinguishable from those who have Wharton degrees."  Id. at 15.  Lyle Ungar, an EMTM co-director, acknowledged that "[there

---

[5]        The transcript of the town hall meeting is attached as exhibit 1 to Penn's February 16, 2010 motion in limine to exclude evidence of subsequent remedial measures.  That motion is docketed as document number 121.

have] occasionally been mistakes made from within" with respect to the marketing of the program.  Id. at 35.  He elaborated: "some of them to my horror only mention Wharton, which I think is, you know, unforgivable."  Id.  However, when asked later whether the EMTM program was "marketed as an exclusively Wharton program to any of you," unidentified audience members responded in the negative.  Id. at 40.[6]

According to Reynolds, the fact that he was considered an engineering student and not a Wharton student was potentially career ending.  Trial Tr. 94:14-15, Reynolds Test. (June 15, 2010).  He felt that in order to be competitive in his field, he needed to have a degree from a top ten business school.[7]  Id. at 97:12-14.  In Reynolds's opinion, the EMTM degree, which he completed in 2004, did not satisfy this need.  So he quit his job at Siemens and enrolled, in September 2005, in the Massachusetts Institute of Technology's executive MBA program.[8]  Id. at 96:11-25.  While his family remained in the Philadelphia area, Reynolds relocated to Massachusetts to complete the year-long program.

II.     Procedural History

This case has evolved rather dramatically over the course of its five year life span.

Reynolds commenced this lawsuit on October 18, 2005 by filing a writ of summons in the

_____

[6]     The transcript reflects no affirmative responses to the question.  See Townhall Meeting Tr. at 40.

[7]     He conceded, however, that he knew when he entered the program that at graduation he would receive a degree from the School of Engineering.  Trial Tr. 53:4-6 (June 15, 2010).

[8]     This was a somewhat curious decision in light of Reynolds's testimony at trial that he did not want an MBA because he already had one from St. Joseph's University.  Trial Tr. 68:3-4, Reynolds Test. (June 15, 2010).

Philadelphia County Court of Common Pleas. On March 6, 2006, Reynolds filed a verified complaint that alleged eight counts[9] against six defendants.[10] All eight counts shared a common core of operative facts: essentially, that Penn had made several representations to Reynolds concerning the nature of the EMTM program and some or all of those representations later turned out to be false. At the same time Reynolds filed his lawsuit, his classmate Harsh filed a lawsuit that contained allegations similar to those contained in Reynolds's complaint. See Harsh v. Univ. of Penn., No. 06-1236.[11] The cases proceeded along parallel schedules but were never formally consolidated.[12]

Penn removed the case to this Court on March 22, 2006. (Doc. No. 1). Subject matter jurisdiction was predicated on 28 U.S.C. § 1331 as count 8 of the complaint alleged violations of the federal RICO statute. Penn filed an answer on May 16, 2006 and the case proceeded to discovery.

---

[9]     The original complaint contained the following eight counts: (1) breach of contract; (2) unjust enrichment; (3) negligence; (4) negligent misrepresentation; (5) intentional misrepresentation; (6) common law fraud; (7) violation of the Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-1 - 9.2(a) (1976); and (8) violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 (1988).

[10]     The original complaint named the following six defendants: (1) The University of Pennsylvania; (2) The School of Engineering and Applied Science of The University of Pennsylvania; (3) The Wharton School of The University of Pennsylvania; (4) Lyle Ungar; (5) Ziv Katalan; and (6) Joel Adler.

[11]     Harsh's lawsuit was originally filed in the Philadelphia County Court of Common Pleas. See Notice of Removal, No. 06-1236 (Doc. No. 1). Penn removed Harsh's case to this court at the same time it removed Reynolds's case.

[12]     At the inception of their lawsuits, Harsh and Reynolds were represented by the same law firm–Messa & Associates, P.C.

The discovery process was contentious, requiring frequent judicial intervention. Penn was compelled to file no fewer than ten discovery motions to obtain necessary documents and information from Reynolds and Harsh.[13] On October 10, 2006, Penn filed a motion to compel Reynolds and Harsh to produce the original paper and electronic copies of several documents that Reynolds had included in his complaint. <u>See</u> Def.'s Mot. to Compel (Doc. No. 12). In that motion, Penn asserted for the first time its belief that Reynolds had altered some of the evidence to support his case. <u>See</u> <u>id.</u> at 3 ("The University suspects that Harsh and/or Reynolds altered the documents for this case."). That motion was referred to Magistrate Judge Charles B. Smith, who ordered Reynolds to produce the requested information. <u>See</u> Order (Nov. 28, 2006) (Doc. No. 17).

On June 14, 2007, Penn filed another motion to compel Reynolds and Harsh to produce electronic data concerning the PowerPoint presentation and emails that they alleged to have contained misrepresentations by Penn. <u>See</u> Def.'s Mot. to Compel. (June 14, 2007) (Doc. No. 31). In essence, Penn's motion requested access to Reynolds's and Harsh's personal computers and Harsh's email account. <u>See</u> <u>id.</u> at 6.[14] On July 12, 2007, I granted Penn's motion. <u>See</u> Order (July 12, 2007) (Doc. No. 33).[15]

---

[13]     I will discuss only those motions relevant to the disposition of this motion.

[14]     In response to Judge Smith's Order dated November 28, 2006, Reynolds and Harsh identified computers that contained copies of relevant PowerPoint presentations and emails. However, Reynolds asserted that his computer had been destroyed in a house fire and Harsh, for his part, asserted simply that he had thrown the computer away. <u>See</u> Def.'s Mot. to Compel at 5-6 (June 14, 2007) (Doc. No. 31). Both individuals, however, had copied all the relevant documents onto their new computers. <u>See</u> <u>id.</u>

[15]     Until October 1, 2007, Reynolds had been represented by Andrew D. Swain of Messa & Associates. On October 1, 2007, Swain withdrew as counsel and Joseph L. Messa

On August 4, 2008, Penn moved for an order excluding the documents that it suspected had been altered by Reynolds and Harsh.  See Def.'s Mot. in Limine (Doc. No. 43).  During discovery, Penn had concluded that the PowerPoint presentation that Reynolds claimed to have relied upon in 2002 contained a Wharton logo that was not available until 2003.  See id. at 8.  Additionally, the allegedly altered presentation had purportedly been saved on Reynolds's computer in 2002 with Adobe 6.0 software that did not become available until 2003.  See id. at 9.  This led Penn to conclude that "the electronic file of [the] fraudulently altered presentation shows signs of date manipulation."  See id. at 8-9.  Upon inspection of Reynolds's computer, Penn found several versions of an email sent by Adler to Harsh discussing the EMTM program.  See id. at 9-10.  Those versions were different from the one recovered from Adler's computer.  See id.  These inconsistencies led Penn to believe that Reynolds and Harsh had fraudulently altered the evidence to support their case against Penn.  See id.  Penn hoped that a favorable ruling on the motion would either "form the basis of a dispositive motion because [Reynolds's complaint is] derived from fraud [or] give [Reynolds] the opportunity to consider withdrawing [his] suit[]."  Id. at 10-11.  On September 15, 2008, I denied the motion, reasoning that "[w]hether plaintiff has fabricated evidence as defendants assert will be a question for the jury."  See Order (Doc. No. 46).

On September 15, 2008, Harsh voluntarily withdrew his case with prejudice.  I granted costs to Penn which the Clerk of Court calculated to be $12,222.49.  See Order, No. 06-1236 (Dec. 17, 2008) (Doc. No. 54).  Several days later, Richard J. Heleniak, the attorney who ultimately would represent Reynolds at trial, entered his appearance on behalf of Reynolds.

entered his appearance.

On November 7, 2008, Penn moved to compel the videotaped deposition of Harsh. See Def.'s Mot. to Compel (Doc. No. 49). I granted that motion. See Order (Nov. 20, 2008) (Doc. No. 51).

Less than two weeks before trial was scheduled to begin,[16] Reynolds voluntarily dismissed his RICO claim. Pl.'s Stipulation of Dismissal (Sep. 1, 2009) (Doc. No. 65). On the same day, he filed a motion to remand to the Court of Common Pleas on the grounds that after dismissal of the RICO claim, this Court lacked subject matter jurisdiction. Pl.'s Mot. to Remand (Sep. 1, 2009) (Doc. No. 66). I denied the motion and retained supplemental jurisdiction over the state law claims. See Order (Sep. 8, 2009) (Doc. No. 69). Trial was rescheduled for September 28, 2009.

On September 18, 2009, Reynolds amended his trial exhibit list to include a DVD recording of the November 1, 2003 town hall meeting. See Supplement to Pretrial Mem. (Doc. No. 77). Penn, in response, moved to exclude any reference to the town hall meeting. See Def.'s Mot. in Limine (Sep. 23, 2009) (Doc. No. 81). It argued that the meeting and statements made therein were subsequent remedial measures and therefore inadmissible under Rule 407 of the Federal Rules of Evidence. See id. In an oral ruling on the day before trial began, I granted Penn's motion.

On September 28, 2009, the day trial was scheduled to begin, Reynolds filed a motion "to Preclude Evidence Related to Anurag Harsh." Def.'s Mot. in Limine (Doc. No. 84). The motion, however, was broader than its title indicates–Reynolds sought to exclude reference to: (1) lawsuits brought by Harsh; (2) Harsh's status as a plaintiff in a parallel proceeding against

---

[16]     By Order dated May 5, 2009, I had scheduled the trial for September 14, 2009.

Penn; (3) Harsh's attorney-client relationship with Messa & Associates; and (4) forty-three of

Penn's exhibits which, according to Reynolds, pertained exclusively to Harsh. See id. Included

in those exhibits was the email exchange between Adler and Harsh that Penn contended

Reynolds and Harsh had altered. Penn opposed the motion but, due to the obvious time

constraints, was unable to brief the matter fully. Instead, it submitted a letter brief in which it

asserted that "the altered evidence and related exhibits are relevant [because] that is what

Reynolds claims he relied [on] in choosing the EMTM program. Even if Reynolds tries to revise

his claim to exclude the altered evidence, he is subject to cross examination against his previous

statements made under oath." Def.'s Letter Br. (Sep. 29, 2009). Penn also pointed out that

Reynolds had included references to the allegedly altered evidence throughout his verified

complaint. Without the benefit of full oral argument, I granted Reynolds's motion and excluded

any reference to Harsh and, more importantly, to any altered documents.[17]

---

[17]     The parties' handling of this motion remains troubling to me. On August 4, 2008,
Penn had moved for the exclusion of the documents it alleged that Reynolds had altered.
See Def.'s Mot. in Limine (Doc. No. 43). Reynolds responded in opposition to the motion,
arguing that "it would be difficult to conceive of evidence more relevant than the documents
which [defendant] seek[s] to preclude, that is, the very documents which contain the
misrepresentations upon which Reynolds relied." Pl.'s Br. in Opposition at 6 (Sep. 5, 2008)
(Doc. No. 44); see also p. 13 supra for a further discussion of Penn's motion. I denied Penn's
motion, holding that "whether [Reynolds] has fabricated evidence as [Penn] assert[s] will be a
question for the jury." See Order (Sep. 15, 2008) (Doc. No. 46).

        The motion Reynolds filed on September 28, 2009 raised exactly the same issue that I had
disposed of in my September 15, 2008 Order. Startlingly, the parties took positions on the
second motion directly opposite to their positions on the earlier motion. Reynolds argued that
the allegedly altered evidence should be excluded at trial and Penn argued that the evidence
should be admitted. The change in positions alone was not problematic–the parties conceivably
could have changed their stances for any number of good reasons. It was regrettable, however,
that both attorneys failed in their obligation as officers of the Court to inform me that I had
already ruled on that issue. Consequently, one year and more than forty docket entries later, I
ruled inconsistently.

The case proceeded to trial. On the first day of trial, Reynolds agreed to dismiss the individual defendants in light of Penn's stipulation that those defendants were acting within the scope of their employment during the relevant time period.[18] See Order (Oct. 2, 2009) (Doc. No. 92). At the conclusion of Reynolds's case, Penn moved to dismiss the claims of negligence, negligent misrepresentation, intentional misrepresentation and fraud on the grounds that each was barred by the statute of limitations. I granted that motion. See Order (Oct. 2, 2009) (Doc. No. 91).

After a five day trial, the jury found in favor of Penn on the UTPCPL claim but awarded Reynolds $435,678.00 on his breach of contract claim. See Verdict Sheet (Oct. 6, 2009) (Doc. No. 97). The jury did not render a verdict on the unjust enrichment claim. See id.

On October 21, 2009, Penn moved for judgement as a matter of law or, alternatively, for a new trial. Def.'s Mot. for Judgment as a Matter of Law (Doc. No. 101). It argued that my exclusion of evidence related to Harsh and the altered documents was erroneous. After hearing oral argument on the question, I denied Penn's motion for JMOL but granted the motion for a new trial. See Reynolds v. Univ. of Penn., 684 F. Supp. 2d 621, 633 (E.D. Pa. 2010) (Doc. Nos. 118 & 119).

In advance of the retrial, both parties filed motions in limine. Reynolds again moved to exclude reference to Harsh and the altered documents. See Pl.'s Mot. in Limine to Preclude Reference to Anurag Harsh (Feb. 16, 2010) (Doc. No. 120). The motion was largely identical to that which he filed prior to the first trial and which resulted in my erroneous ruling. Penn again

---

[18] Penn correspondingly agreed that Reynolds could call the individuals to testify as on cross and that the individual defendant would appear for trial without being subpoenaed.

moved to exclude reference to subsequent remedial measures taken by the University.[19]

See Motion in Limine to Exclude Evidence of Subsequent Remedial Measures (Feb. 16, 2010)

(Doc. No. 121). This motion, however, was slightly broader than the motion Penn filed before

the first trial in that it sought to preclude reference to changes to the EMTM website.[20] On June

2, 2010, I denied Reynolds's motion and granted Penn's motion. See Mem. and Order (June 2,

2010) (Doc. No. 128).

Retrial on the breach of contract and unjust enrichment claims began on June 15, 2010.

At the beginning of the second day of trial, Reynolds moved for reconsideration of my exclusion

of any reference to the town hall meeting. He argued for the first time that Rule 407 does not

apply to breach of contract claims. Upon reconsideration, I affirmed my decision. At the

conclusion of Reynolds's case, Penn moved for JMOL. I reserved judgment on the motion until

after trial. Trial Tr. 91:14-17 (June 17, 2010). Penn renewed and supplemented its motion at the

close of all evidence. Trial Tr. 104:2-105:7 (June 21, 2010). The jury found that Penn had not

breached a contract with Reynolds but that Penn had been unjustly enriched. It accordingly

awarded $66,000 to Reynolds.

---

[19]    Penn also moved, in its pre-trial memorandum, to exclude at the retrial any reference to the first trial. See Def.'s Pre-Trial Mem. at 11 (June 1, 2010) (Doc. No. 127). It asserted that cross-examination by reference to the transcript of the first trial would be unnecessarily confusing. See id. Finding no precedent whatsoever for that argument, I rejected it.

[20]    During the first trial, Penn had objected to reference to the website changes. I sustained the objection on the grounds that such changes were inadmissible subsequent remedial measures.

The present cross-motions followed.[21]

STANDARD OF REVIEW

A.    Motion for a New Trial

Rule 59 governs the court's ability to grant a new trial.  The rule allows the court to grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ."  Fed. R. Civ. P. 59(a)(1)(A).  The standard by which a motion for a new trial is judged depends on the grounds upon which the motion rests.  Klein v. Hollins, 992 F.2d 1285, 1289-90 (3d Cir. 1993).

Where a new trial is sought on the grounds that the jury's verdict was against the weight of the evidence, the court may grant the motion "only where the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience."  Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1353 (3d Cir. 1991).  This high standard provides due respect for the jury's primary function as factfinder.  Otos Tech., Co., Ltd. v. OGK America, Inc., No. 03-1979, 2007 WL 2374995, at *3 (D.N.J. Aug. 13, 2007) (citing Hurley v. Atlantic City Police Dep't., 933 F. Supp. 396, 403 (D.N.J. 1996)).

Where, on the other hand, the asserted basis for a new trial involves a matter originally within the trial court's discretion–e.g., evidentiary rulings–the court has much wider latitude. Klein, 992 F.2d at 1289-90.  In such cases, the court's inquiry is twofold: (1) whether an error

---

[21]    With respect to Reynolds's present motion for a new trial, I note that he filed his motion on July 2, 2010 (Doc. No. 145) without a supporting brief in violation of Local Rule of Civil Procedure 7.1(c).  I ordered him to file such a brief by August 9, 2010.  See Order (July 26, 2010) (Doc. No. 163).  He did not file his brief until August 10, 2010.  (Doc. No. 167).

was in fact committed; and (2) whether that error was so prejudicial that denial of a new trial would be "inconsistent with substantial justice." Farra v. Stanley-Bostitch, Inc., 838 F. Supp. 1021, 1026 (E.D. Pa. 1993) (citing Bhaya v. Westinghouse Elec. Corp., 709 F. Supp. 600, 601 (E.D. Pa. 1989), aff'd, 922 F.2d 184 (3d Cir. 1990)).  With respect to the determination of prejudice under the second prong, "a new trial must be granted unless it is highly probable that [the erroneous ruling] did not affect the [objecting party's] substantial rights." Bhaya, 709 F. Supp. at 601-602 (citing McQueeney v. Wilmington Trust Co., 779 F.2d 916, 928 (3d Cir. 1985)).

B.      Motion for Judgment as a Matter of Law

Rule 50(b) of the Federal Rules of Civil Procedure governs the court's ability to grant JMOL after a jury trial.  JMOL, a sparingly invoked remedy, is appropriate only where "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000).  In determining whether such a legally sufficient evidentiary basis exists, the court must review all the evidence in the record and draw all reasonable inferences in favor of the non-moving party. Id. at 150.  The court may not, however, make credibility determinations or weigh the evidence–those functions are reserved for the jury. Id.  In sum, a motion for JMOL "should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).

DISCUSSION

I.      Reynolds's Motion for a New Trial Will Be Denied

        Reynolds moves for a new trial on two grounds.  First, he argues that my exclusion of any

reference to the EMTM website alterations and the town hall meeting was erroneous because

Rule 407 does not apply to breach of contract claims.  Second, he argues that even if the

exclusion of that evidence was proper I improperly prohibited him from using statements made at

the town hall meeting for impeachment purposes.  I will discuss each argument in turn.

        A.      Rule 407 Applies to Breach of Contract Claims

        Rule 407 provides:

> When, after an event, measures are taken which, if taken previously,
> would have made the event less likely to occur, evidence of the
> subsequent measures is not admissible to prove negligence or
> culpable conduct in connection with the event. This rule does not
> require the exclusion of evidence of subsequent measures when
> offered for another purpose, such as proving ownership, control, or
> feasibility of precautionary measures, if controverted, or
> impeachment.

The primary purpose of Rule 407 is to encourage individuals "to take, or at least not to

discourage individuals from taking, steps in furtherance of added safety."  See Fed. R. Evid. 407,

Advisory Comm.'s Note; see also Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 415 (3d

Cir. 2002) ("Rule 407 rests on the strong public policy of encouraging manufacturers to make

improvements for greater safety.") (internal quotation marks omitted).

                1.      The Plain Language of Rule 407 Indicates that it Applies to Breach of
                        Contract Claims

        Plaintiff asserts that the plain language of Rule 407 demonstrates that the Rule is

inapplicable to contract disputes.  Def.'s Br. at 6.  He points specifically to the clause "evidence

20

of the subsequent measures is not admissible to prove negligence or culpable conduct . . . ." He

implies, without saying so directly, that a breach of contract is not the type of culpable conduct to

which the Rule is meant to apply.

I disagree. Had the drafters of the Rule intended it to apply only to tortious conduct, they

could have used the words "tortious conduct" in place of "culpable conduct." By choosing the

broader of the two phrases, the drafters clearly demonstrated their intent not to confine the

application of the Rule to tort cases. Because a breach of contract is culpable conduct, see Pastor

v. State Farm Mut. Auto. Ins. Co., 487 F.3d 1042, 1045 (7th Cir. 2007) (Posner, J.), I find that

the plain language of Rule 407 indicates that it applies to breach of contract cases.

       2.     The Policy Underlying Rule 407 Indicates that it Applies to Breach of
            Contract Claims

Second, the purpose of Rule 407 applies with equal force to both tort cases and breach of

contract cases. Judge Posner, writing for the Court of Appeals for the Seventh Circuit in Pastor,

recognized as much. There, the plaintiff argued that under the terms of her insurance policy the

defendant was obligated to pay her $10 for every day that her car was unusable but that she did

not rent a car.[22] See Pastor, 487 F.3d at 1044. The parties disagreed over the contractual

definition of "day." Id. at 1045. The defendant argued that "day" meant twenty-four hours. Id.

The plaintiff, on the other hand, argued that "day" meant any part of a day. Id. In support of her

argument, the plaintiff cited a subsequent version of the policy in which the defendant had

_____

[22]      The procedural background of the Pastor case is somewhat different than the
present case. There, the plaintiff sought class certification for her breach of contract claim. The
district court declined to certify the class on the ground that such a class would be unmanageable.
On appeal, the plaintiff argued that even if the case were unmanageable for the purpose of
assigning liability the court should have certified the class for the purpose of determining the
contractual definition of "day." Id. at 1045. As noted in the text, the Seventh Circuit disagreed.

defined "day" as twenty-four hours.  Id.  She argued that such a change was a "confession" by the defendant that her interpretation was correct.  Id.  The Seventh Circuit held that "to use at a trial a revision in a contract to argue the meaning of the original version would violate Rule 407 of the Federal Rules of Evidence, the subsequent-repairs rule, by discouraging efforts to clarify contractual obligations, thus perpetuating any confusion caused by unclarified language in the contract."  Id.

The present case is analogous.  Penn revised its EMTM marketing materials in light of the apparent confusion of Reynolds and his classmates.  It also held a town hall meeting to discuss the clarifications and address student concerns with respect thereto.  As the Pastor Court recognized, such clarifications are inadmissible at trial under Rule 407.  Id.  To hold otherwise would discourage Penn, and organizations like it, from making clarifications necessary to avoid future confusion.  Such an arrangement of incentives would directly contradict the policy underlying Rule 407.

Reynolds's attempt to distinguish Pastor is unavailing.  He argues first that Pastor is factually distinguishable from this case.  Pl.'s Br. at 6.  The only distinction he points to, however, is the fact that Pastor involved a class action and the present case does not.  Id. ("The result must be viewed in the context of the entire case, which involved a class action, and the evidence was presented as a means of attempting to make a class wide determination of the meaning of the undefined terms as it would effect the numerous individual members of the class.").  That distinction is immaterial.  Rule 407 applies to any case–whether filed by a single plaintiff or a class–to preclude the introduction of subsequent remedial measures to prove negligence or culpable conduct.

Reynolds also argues that the cases upon which the <u>Pastor</u> Court relied all involved personal injury claims. See <u>id.</u> at 6-7. Review of that decision, however, reveals a discussion of cases applying Rule 407 to remedial measures that were not "repair[s] in the literal sense." See <u>Pastor</u>, 487 F.3d at 1045. For example, the court noted that <u>Hickman v. GEM Ins. Co.</u>, 299 F.3d 1208, 1213-14 n.9 (10th Cir. 2002), applied Rule 407 to a dispute over the meaning of an insurance clause. See <u>id.</u> Moreover, the fact that the <u>Pastor</u> Court cited cases involving personal injury does not mean that Rule 407 applies only in such cases. It simply means that the Rule applies more frequently in personal injury cases. A review of the case law confirms this meaning. <u>See</u>, <u>e.g.</u>, <u>Lust v. Sealy, Inc.</u>, 383 F.3d 580, 585 (7th Cir. 2004) (noting "there is no basis in the language or rationale of the rule for confining it to nonintentional torts, though they are the usual occasion for its invocation.").

### 3. Application of Rule 407 Must Be Predictable

Finally, I find that Rule 407 applies to breach of contract claims because the application of the Rule cannot depend on whether a plaintiff chooses, potentially years later, to bring a lawsuit sounding in tort or one sounding in contract. In order for the Rule to accomplish its salutary purpose of incentivizing remedial action, its application at trial must be predictable. That is, a potential defendant must be confident that when he takes remedial action it will not later be admitted at trial as evidence of his liability.

Reynolds's suggested distinction would dramatically reduce the predictability of the Rule's application. Before taking remedial action, a potential defendant would need to assess the

likelihood that a plaintiff will couch his claim in contract terms.[23]  The mere possibility, however remote, that the facts might support a contract claim would interpose a substantial practical obstacle to the remedial action.  By making a necessary repair, thereby preventing future injury, an individual would risk admitting present liability.  This is exactly what Rule 407 is designed to avoid.  By applying Rule 407 uniformly to both tort and contract claims, individuals are incentivized to repair potentially injurious conditions regardless of what type of claim might arise therefrom.  Accordingly, I reject plaintiff's argument that Rule 407 does not apply to breach of contract claims.

      B.      **Reynolds's Ability To Use the Subsequent Remedial Measures for Impeachment Purposes Was Not Improperly Restricted**

Rule 407 allows evidence of subsequent remedial measures to be offered in order to impeach a witness.  See Fed. R. Evid. 407.  Reynolds argues that he was improperly prohibited from using the website alterations and statements made in the town hall meeting for impeachment purposes.  Pl.'s Br. at 7-8.

Reynolds's argument pertains to an exchange on the third day of trial.  Reynolds had called Ziv Katalan, co-director of the EMTM program, to testify as on cross.  Trial Tr. 36:14-25, Katalan Test. (June 17, 2010).  Reynolds contended throughout the case that he had been promised "official alumnus status" but that he had received only "honorary alumnus status." See Trial Tr. 55:21-25, Reynolds Test. (June 15, 2010).  In inquiring into this discrepancy, Reynolds's counsel asked Katalan: "[d]id you have a description of alumni benefits for EMTM graduates on the website in 2004?"  Trial Tr. 36:14-15, Katalan Test. (June 17, 2010).  Penn's

---

    [23]     In cases like the one at bar, this would be akin to predicting the future.  Indeed, in its original posture, Reynolds's case included both breach of contract and tort claims.

counsel immediately objected on the grounds that the question referenced website clarifications that I had excluded as subsequent remedial measures.  Id. at 36:16.  At sidebar, Reynolds's counsel stated: "I'm gonna ask him whether he – the program ever told him the EMTM people were not official alumnus [sic]."  Id. at 37:15-17.  I instructed him not to ask that question because to do so would violate Rule 407.  Id. at 37:18-19.  In response, Reynolds's counsel asserted that he was simply referring to the website for impeachment purposes: "[i]f he says no, he didn't [tell EMTM students that they were not official alumni], I should be able to use [the 2004 version of the website] to impeach him."  Id. at 38:13-15.

I returned briefly to my chambers to consider whether Reynolds should be allowed to refer to the website.  After reflection, I noted "I think Rule [407's] exception is designed to prevent, on [d]irect, a client getting on the stand and lying about whether it ever changed, and then not being able to use that to impeach that statement."  Id. at 39:20-25.  I went on to explain that I was concerned that Reynolds was attempting essentially to fabricate an impeachment opportunity by questioning Katalan about statements made solely on the website and at the meeting before Katalan had testified inconsistently.  Id. at 39:24-40:1.  Accordingly, I sustained Penn's objection and informed Reynolds's counsel that he would not be permitted to use the excluded evidence to impeach Katalan.  Id. at 41:12-16.

Nevertheless, Reynolds's counsel asked Katalan "in representing to prospective EMTM students that they would have full advantages of being Penn Engineering and Wharton alumni, does that indicate that they would have official alumni status in each of those schools?"  Id. at 41:23-42:1.  Katalan answered "yes."  Id. at 42:2.  Reynolds's counsel then asked "[d]id that policy ever change?"  Id. at 42:3.  Penn's counsel immediately objected and I sustained the

objection. Id. at 42:4-6. The following exchange then occurred between Reynolds's counsel and Katalan:

> Q: Did you, Dr. Katalan, ever tell EMTM students through any means that they were not official Wharton alumnus [sic]?
> A. No.
> Q. Did the EMTM program ever tell EMTM students that they were not official Wharton alums?
> A. No.

Id. at 42:8-13.

Reynolds now argues that he should have been permitted to impeach Katalan with the website and the statements he made at the town hall meeting. Specifically, he would have referred to a statement on the revised website that noted "the Wharton School has also invited graduates of EMTM to become, in effect, 'honorary members' of the Wharton alumni network and online community." Pl.'s Ex. 2 at 5. I disagree with Reynolds for three reasons.

First, the two questions he asked Katalan that yielded arguably impeachable answers were themselves improper. The only instances in the record of Penn informing EMTM students that they were not official alumni of the Wharton School occurred at the town hall meeting and on the 2004 EMTM website–both of which I had excluded as subsequent remedial measures.[24] Therefore, Katalan could not have answered those questions without referring to the excluded evidence. Because the questions themselves were improper and therefore should have been stricken, it was not improper to prohibit impeachment with respect to Katalan's answers.

---

[24] Reynolds also testified that Katalan told him at the Starbucks meeting that he was not a Wharton student. Trial Tr. 83:6-8, Reynolds Test. (June 15, 2010). Katalan denied the allegation. Trial Tr. 64:22-65:2, Katalan Test. (June 17, 2010). Although cross examination on that alleged incident would have been appropriate, the questions asked by Reynolds at trial were not limited to that specific incident. They were therefore improper.

Second, counsel for Reynolds attempted to circumvent my ruling by fabricating an impeachment. The impeachment exception to Rule 407 is designed "to prevent litigants from taking unfair advantage of the Rule by adopting a position at trial that is inconsistent with their previous decision to take remedial measures after the accident." Minter v. Prime Equip. Co., 451 F.3d 1196, 1212 (10th Cir. 2006). Muzyka v. Remington Arms Co., Inc., 774 F.2d 1309, 1312 (5th Cir. 1985) (cited by Petree v. Victor Fluid Power, Inc., 887 F.2d 34, 38 (3d Cir. 1989)), illustrates this principle. There, the question presented to the jury was whether "[the rifle at issue] was unreasonably dangerous because the bolt-action design required that the rifle be placed in the "fire" position, i.e., the safety-off position, before it could be unloaded." Id. at 1310. A defense expert took the stand on direct and testified that "the two-position, bolt-lock safety was the best safety available–indeed, that it was the best and the safest rifle on the market." Id. Under the circumstances, the Court of Appeals for the Fifth Circuit held that the district court erred in excluding evidence of a subsequent design change offered for impeachment purposes. See id. at 1314. By testifying that the rifle was the safest on the market, the defense expert opened the door to questioning on why the defendant would change such a "superlative" design. See id.; see also Wood v. Morbark Indus., Inc., 70 F.3d 1201, 1208 (11th Cir. 1995) (where the designer of a wood chipper testified that its seventeen inch shoot was the "safest length chute you could possibly put on the machine[,]" such testimony opened the door to cross examination by reference to subsequent modifications to the chute).

The present case is different in one important respect–Katalan did not open the door to the introduction of the subsequent remedial measures. Unlike the defense expert in Muzyka, whose testimony that the rifle was the safest on the market was inconsistent with the decision to

change the safety mechanism, Katalan did not, without prompting, adopt a position inconsistent

with the decision to take remedial action. Instead, plaintiff's counsel attempted to open the door

by asking whether the EMTM students were informed that they would be honorary alumni of the

Wharton School–a question that Katalan could not answer without referring to the excluded

evidence.[25] The situation was a "win-win" for plaintiff–if Katalan answered affirmatively, he

would have testified about the subsequent remedial measures that I had previously excluded. If,

on the other hand, Katalan answered in the negative, plaintiff's counsel would then attempt to

introduce the subsequent remedial measures for impeachment purposes. In either event, the jury

would hear about the excluded remedial measures. The Rule simply does not permit a party on

cross to fabricate an impeachment in order to introduce evidence of subsequent remedial

measures. A contrary holding would cause the impeachment exception to engulf the rule

completely.

Finally, the probative value of the impeachment evidence was substantially outweighed

by its prejudicial effect. It was therefore excludable under Federal Rule of Evidence 403. See

Stecyk, 295 F.3d at 416 ("Under Rule 407, together with the Rule 403, unfair prejudice/probative

value weighing, the trial court retains broad power to insure that remedial measures evidence is

not improperly admitted under the guise of the impeachment exception."). The probative value

of the impeachment evidence was that it served to discredit Katalan and thereby reduce the

effectiveness of his testimony.[26] See McDaid v. Stanley Fastening Sys., LP, No. 07-709, 2008

---

[25]     This situation illustrates why, as noted in my ruling supra, the questions
themselves were improper.

[26]     The evidence would not have been admissible as substantive proof of the
assertions that were made at the meeting and on the website.

WL 2928387, at *1 (E.D Pa. July 28, 2008) (quoting Chiasson v. Zapata GulfMarine Corp., 988 F.2d 513, 517 (5th Cir. 1993) (defining impeachment evidence and discussing its uses)). The value of impeaching Katalan on this point was minimal. This is especially true here because Reynolds's counsel was repeatedly instructed not to refer to the 2004 website or the town hall meeting. Indeed, he was so instructed mere minutes before he asked these questions. Had he obeyed my instruction and not asked the questions, there would be no need to impeach Katalan.

The prejudicial effect of introducing the impeachment evidence, however, was significant. It would be extremely difficult for the jury to hear the statements made at the town hall meeting and see the 2004 website clarifications without inferring that those measures were admissions of liability. This, of course, is exactly the inference that Rule 407 is designed to prevent. See Kelly v. Crown Equip. Co., 970 F.2d 1273, 1276 (3d Cir 1992) ("Rule 407 rejects the suggested inference that fault is admitted when remedial measures are taken subsequent to an injury."). Accordingly, even if Reynolds's line of questioning were otherwise proper, I would exercise my discretion under Rule 403 to preclude the impeachment evidence. See Petree, 887 F.2d at 39 (quoting 2 Weinstein & Berger, Weinstein's Evidence ¶ 407[05], at 407-33 (1988)) ("Care should be taken that needless inquiry and concern over credibility does not result in unnecessarily undercutting the policy objective of the basic exclusionary rule.").

For these reasons, my decision not to allow Reynolds to attempt to impeach Katalan by reference to the excluded evidence was not erroneous.

C.	Reynolds's Motion for a New Trial Will Be Denied

In sum, I find that Rule 407 applies to breach of contract claims. I further find that Reynolds's proposed impeachment of Katalan by reference to the excluded evidence was legally impermissible. I will accordingly deny Reynolds's motion for a new trial.

II.	Penn's Motion for JMOL Will Be Granted

Penn moves for judgment as a matter of law pursuant to Rule 50(b). It offers two arguments in support of its motion. First, because a contract governed the relationship between Penn and Reynolds, the doctrine of unjust enrichment is inapplicable. Second, Reynolds's complaint constituted a fraud on the court and therefore his complaint must be dismissed. Reynolds, of course, disagrees with both arguments.

A.	Procedural Satisfaction

As an initial matter, I must ensure that Penn has satisfied the procedural dictates of Rule 50.[27] In order to move for JMOL after a jury has returned a verdict, the moving party must have moved for JMOL, pursuant to Rule 50(a), at the close of the nonmovant's case. See Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1172 (3d Cir. 1993). In its Rule 50(a) motion, the moving party must specify "the law and facts on which the moving party is entitled to judgment." See Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 519 n.18 (3d Cir. 1998). The legal and factual basis for the Rule 50(a) motion must be set forth with sufficient specificity "to afford the party against whom the motion is directed with an opportunity to cure possible defects in proof which otherwise might make its case legally insufficient." Id. (quoting Lightning Lube, 4 F.3d at 1173). Absent such a motion, "judicial reexamination of the evidence abridges a

---

[27]	As Reynolds does not raise this issue, I address it sua sponte.

30

party's right to a trial by jury," <u>Lightning Lube</u>, 4 F.3d at 1173 (<u>quoting</u> <u>Fineman v. Armstrong</u>

<u>World Indus., Inc.</u>, 980 F.2d 171, 183 (3d Cir. 1992)), and the moving party thereby waives its

right to raise the issue in its Rule 50(b) motion after trial. <u>Chainey v. Street</u>, 523 F.3d 200, 218

(3d Cir. 2008) ("[A moving party's] failure to raise an issue in a Rule 50(a)(2) motion with

sufficient specificity to put the [non-moving party] on notice waives the [moving party's] right to

raise the issue in [its] Rule 50(b) motion.").

At the conclusion of Reynolds's case, Penn moved for JMOL pursuant to Rule 50(a) on

three grounds:[28] (1) that Reynolds had disavowed his verified complaint by asserting that he had

not read it; (2) that the terms of the contract were not sufficiently clear, precise and

understandable to be enforceable; and (3) that the evidence did not support a finding of unjust

enrichment. Trial Tr. 89:5-91:13 (June 17, 2010). At the close of all evidence, Penn

supplemented its motion by proffering two additional bases: (1) that Penn had conclusively

proven that Reynolds's case had been based on "phoney" documents; and (2) that Reynolds

committed fraud on the court by submitting altered documents in support of his case. Trial Tr.

104:7-105:7 (June 21, 2010). It is clear that the argument Penn presently advances in support of

its motion for JMOL–that an express contract governed the relationship between the parties and

therefore unjust enrichment principles are legally inapplicable–was not presented in either of its

trial motions.

Under normal circumstances, then, Penn would be precluded from asserting that an

express contract governed the relationship between the parties and therefore that it is entitled to

---

[28]     Defendant's counsel stated that the motion was based on two grounds. Trial Tr.
89:6, Golden Arg. (June 17, 2010). However, he actually argued the motion on three grounds.

JMOL on the unjust enrichment claim. However, as the Court of Appeals noted in Williams v. Runyon, 130 F.3d 568, 572 (3d Cir. 1997), "this issue did not arise under normal circumstances." There, the Court held that "where a party did not object to a movant's Rule 50(b) motion specifically on the grounds that the issue was waived by an inadequate Rule 50(a) motion, the party's right to object on that basis is itself waived." Williams, 130 F.3d at 572.

In Williams, the plaintiff sued the United States Postmaster General for various Title VII violations. Id. at 569-70. Prior to trial, the Postmaster moved for dismissal on the grounds that the plaintiff had not exhausted her administrative remedies. Id. at 570. The district court denied the motion and scheduled the case for trial. Id. At the conclusion of the plaintiff's case, the Postmaster moved for JMOL under Rule 50(a), stating "there is no legally sufficient evidentiary basis for a reasonable jury to find for the Plaintiff on any of the issues that counsel have set forth in this case." Id. at 571. The jury found in favor of the plaintiff on one count and against her on the others. Id. The Postmaster then filed a Rule 50(b) motion which included, inter alia, the argument that the plaintiff had not exhausted her administrative remedies. Id. The plaintiff did not argue that the exhaustion argument had not been raised in the Rule 50(a) motion, instead choosing to address the merits of the argument. Id. The district court granted the Rule 50(b) motion on the ground that the plaintiff had not properly exhausted her administrative remedies. Id.

On appeal, the Court of Appeals noted that "[i]t is clear that the Postmaster did not raise the exhaustion issue in his motion for a directed verdict." Id. at 572. However, it held that the plaintiff's failure to raise that argument in the district court resulted in waiver of the argument. Id. "The need to preserve the issue through a proper objection in the context of Rule 50 is to

ensure that both parties are aware of and can raise dispositive issues earlier in the proceeding rather than later, so that the district court can resolve the issues correctly and without delay. This is just as true when a plaintiff opposes a Rule 50(b) motion as when a defendant moves for a directed verdict under Rule 50(a)." Id.

This case is analogous. Although Penn did not raise in its Rule 50(a) motion the argument that the express contract between the parties precluded an unjust enrichment claim, Reynolds did not, in response to Penn's Rule 50(b) motion, object to that failure. Instead, Reynolds merely acknowledged that "[Penn] has now filed a somewhat different [m]otion" and then proceeded to address Penn's argument on its merits.[29] Def.'s Br. at 1. Such a response constitutes a waiver by Reynolds of any argument that Penn did not satisfy the requirements of Rule 50.

B.    Merits

Having found that Penn is entitled to advance both arguments,[30] I will now proceed to address their merits. Penn first argues that it is entitled to judgment as a matter of law on

---

[29]    To be clear, Reynolds's passing reference to the fact that Penn's Rule 50(b) motion is "somewhat different" from its Rule 50(a) motion is insufficient to constitute an objection. Reynolds's brief includes no discussion of the difference between Penn's Rule 50(a) and Rule 50(b) motions, it cites no case law addressing the consequence of such difference and it does not even acknowledge that such a difference is legally significant. Instead, Reynolds's brief addresses the merits of Penn's argument directly. The apparent purpose of including the "somewhat different" language in the brief was to point out to the court that Penn had abandoned several of its other grounds for JMOL, not to object to the recharacterization. This is a classic case of waiver.

[30]    Penn's argument that Reynolds's complaint must be dismissed because he committed fraud on the court was properly raised and preserved at trial. Trial Tr. 104:7-105:7 (June 21, 2010). Of course, even if it had not been preserved, Reynolds has waived any objection on that ground.

Reynolds's unjust enrichment claim because the relationship between the parties was governed by an express contract.[31]  Pennsylvania law provides that "the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract[.]"[32]  Wilson Area Sch. Dist. v. Skepton, 895 A.2d 1250, 1254 (Pa. 2006).  In order for an unjust enrichment claim to be barred, however, the express contract must be enforceable.  See Masterson v. Fed. Exp. Corp., No. 07-2241, 2008 WL 4415700, at *5 (M.D. Pa. Sept. 26, 2008).  A contract is enforceable where: (1) both parties manifested an intention to

---

[31]  At the conclusion of the retrial of this matter, I informed counsel for both parties that I intended to instruct the jury to return a verdict on the unjust enrichment claim regardless of its verdict on the breach of contract claim.  Trial Tr. 91:5-24 (June 21, 2010).  I requested this advisory verdict as a precautionary measure to prevent having to retry this case for a third time in the event that the jury returned a verdict in favor of Reynolds on the breach of contract claim and that verdict was overturned either at the post-trial motion stage or on appeal.  Trial Tr. 89:5-91:13 (June 17, 2010).
       I instructed the jury accordingly:

> Mr. Reynolds can only recover for unjust enrichment if you find that there is no breach of contract between him and the University of Pennsylvania.  In other words, it's an alternative claim by Mr. Reynolds.  He cannot recover on both claims.  However, despite the fact that [Reynolds] cannot recover on both claims we want the benefit of your judgment on both claims.  Therefore you should enter the interrogatories on unjust enrichment regardless of what your decision is with respect to Plaintiff's breach of contract claim.

Trial Tr. 27:11-20, Jury Charge (June 22, 2010).  Shortly thereafter, I summarized my instruction: "[b]ut I'm asking you on the verdict sheet which I'll explain to you, nonetheless to decide both claims, with the understanding that if you should decide both claims in favor of [Reynolds] he will only recover on one."  Id. at 27:25-28:4.

[32]  The jury verdict form did not include a separate question as to whether an enforceable contract had been formed because, until Reynolds's response to the present motion, that was one of the few undisputed facts in this long and contentious litigation.  The parties agreed that there was a contract but disagreed as to its terms.  See Trial Tr. 15:21-25, Heleniak Opening (June 15, 2010); Trial Tr. 29:1-31:12, Golden Opening (June 15, 2010).  Indeed, the parties had operated under the terms of the contract for more than three years.

be bound by the agreement; (2) the terms of the agreement are sufficiently definite to be enforced; and (3) there was consideration. ATACS Corp. v. Trans World Commc'ns., Inc., 155 F.3d 659 (3d Cir. 1998).

No reasonable juror could conclude that the first and third elements were not satisfied in this case. "In assessing intent, the object of inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 582 (3d Cir. 2009). The intent of the parties in this case to be bound by the contract could hardly have been clearer. Reynolds submitted an application, paid his tuition and attended EMTM classes for nearly three years. Penn invited Reynolds into the EMTM program, accepted his tuition payments and provided him with three years worth of education. The consideration element was satisfied as well. Reynolds made tuition payments and Penn promised to provide him with the bargained-for education. See Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman, 795 F.2d 291, 299 (3d Cir. 1986) ("Consideration confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance or return promise bargained for and given in exchange for the original promise.") (internal quotation marks omitted).

Questions arise, however, with respect to the second element. "Whether the terms of a contract are sufficiently definite is a question of law [appropriate for disposition by the court]." Am. Eagle Outfitters, 584 F.3d at 585. The Court of Appeals has distinguished the question at issue here–whether the contractual terms are sufficiently definite so as to be enforceable–from the related yet distinct question of whether the contractual terms are unambiguous. See id. at 586-87 (reviewing a contract and noting that the terms were sufficiently definite to render the

contract enforceable but that the terms were ambiguous and therefore not susceptible of judicial interpretation); see also Ambrose v. Krause Publ'n., Inc., 354 F. App'x 711, 714 (3d Cir. 2009) (same); Boyd v. Cambridge Speakers Series, Inc., No. 09-4921, 2010 WL 2545541, at *5 n.11 (E.D. Pa. June 18, 2010) ("a court may find that the parties intended to be bound and that the terms of the agreement are sufficiently definite so that an enforceable contract was formed as a matter of law, but that the language chosen by the parties is ambiguous, necessitating interpretation of the contract terms by a jury.") (internal quotation marks omitted). Where contractual terms are indefinite, the contract is unenforceable. See Am. Eagle Outfitters, 584 F.3d at 587. Where contractual terms are ambiguous, the contract is enforceable but must be submitted to a jury for resolution of the ambiguity. Id. In any event, "courts generally disfavor the destruction of contracts because of uncertain terms." Consol. Rail Corp. v. Canada Malting Co., Ltd., No. 98-5984, 2000 WL 151160, at *9 (E.D. Pa. Feb. 10, 2000).

Lombardo v. Gasparini Excavating Co., 123 A.2d 663, 666 (Pa. 1956), involved the relatively rare circumstances in which a court found contractual terms too indefinite to be enforced. There, the plaintiff attempted to convince the defendant to strip mine the coal from the plaintiff's land. Id. at 664. The defendant met with the plaintiff and promised to send a dragline[33] to the property as soon as one was available. Id. The parties did not discuss the terms of the contract ("first contract") at that point. Id. The defendant never sent the dragline to the property and the plaintiff eventually lost his license to mine that land. Id. When the defendant later acquired the license and commenced mining, the plaintiff threatened to sue. Id. at 665. In exchange for a promise not to sue from the plaintiff, the defendant allegedly offered one-half of

---

[33]     A dragline is a piece of coal mining equipment.

the profits obtained from the strip-mining of the land ("second contract").  Id.  The plaintiff later

sued to enforce that contract.  Id.  The Pennsylvania Supreme Court held that the second contract

was unenforceable because the plaintiff could not have held a reasonable belief that the first

contract was enforceable.  Id.  Therefore, his promise not to sue on the first contract did not

constitute consideration for the second contract.  Id.  The court reasoned that the first contract

was unenforceable because its terms were indefinite.  Id. at 666.  It noted "[h]ere there was no

agreement or even discussion as to any of the essential terms of the alleged bargain such as time

or manner of performance, price to be paid, or the like."  Id.  Under those circumstances, the

contract was "much too indefinite for plaintiff to reasonably believe he could ever enforce it in an

action at law for damages."  Id.

My review of the case law reveals that courts more frequently find contractual language

to be ambiguous than indefinite.  American Eagle Outfitters illustrates the distinction between an

indefinite contract and an ambiguous contract.  See id.  There, the plaintiff was an American

clothing retailer and the defendant was a British clothing retailer.  Both companies used eagles as

their trademarks.  In order to prevent infringement, the parties entered into a written contract

governing the use of their trademarks.  Prior to trial, the defendant argued that the contract was

unenforceable on the grounds that two of the ten contractual provisions were indefinite.  Id. at

588.  The arguably indefinite provisions stated:

> Parties agree as follows:
> . . .
> •    Perpetual and worldwide pertaining to good of [the
>      defendant's] registrations
> . . .

• Each party shall consent to the registration of the other's eagles and [the plaintiff] shall withdraw its opposition and [the defendant's] application in the US

Id. at 579.

The Court of Appeals held first that the terms of the contract were not indefinite because "the parties covered all the necessary bases–there are no undetermined matters–and the agreement is not impossible to understand." Id. at 585. It noted that courts ordinarily find a contract to be indefinite only where "the parties never reach[] any kind of accord over the necessary components of their deal." Id. (citing Mazzella v. Koken, 739 A.2d 531, 537 (Pa. 1999); Lombardo v. Gasparini Excavating Co., 123 A.2d 663, 666 (Pa. 1956)). "The parties addressed all the essential issues that necessitated their meeting in London: the use of the eagle logo, [the plaintiff's] right to sell its products online and overseas, the payment of taxes and attorneys' fees, [the plaintiff's] withdrawal from the golf market, and the scope and nature of each parties' registration." Id. at 586. Because the contract addressed all the material terms, it was not too indefinite to be enforced. Id.

Nevertheless, the Court found the two contractual provisions set forth above to be ambiguous. See id. at 586-87. "[A] contract is ambiguous, and thus presents a question of interpretation for a jury, if the contract is reasonably susceptible of different constructions and capable of being understood in more than one sense." Id. at 587 (internal quotation marks omitted). The Court noted that the agreement "[was] not a prime example of clear drafting" as it was "marked by incomplete sentences and haphazard punctuation." Id. at 585. It concluded that there was more than one reasonable interpretation of the agreement and therefore remanded the case in order to have a jury resolve the ambiguity. Id. Notably, the ambiguity did not render the

38

contract unenforceable.  Id. at 586 ("Disputes over the meaning of a given phrase are common in contract disputes; the presence of such interpretative ambiguity, however, does not go to whether the contract is enforceable, but rather who (the judge or the jury) must decide what the given clause means.").

The present case is analogous.  The parties did not disagree over the essential terms of the contract; rather, they disagreed over the definition of several of those terms.[34]  They agreed on the price that Reynolds would pay–approximately $100,000 in total.  Trial Tr. 55:5, Reynolds Test. (June 15, 2010) ("[Reynolds]: Yeah, we talked about the tuition, it was $100,000 . . . .").  They also agreed on what he would receive in return.  First, he'd receive 20 course units of instruction, see id. at 68:23-25 ("[Reynolds]: . . . Yeah, the program went from September to May, and then you had the summer off, and I had intended – so you had to complete 20 to graduate."); see also Def.'s Ex. 8 at 4 (noting that the masters degree consisted of 20 course units), over a term of between two and four years.  See Def.'s Ex. 8 at 4; see also Trial Tr. 69:3-4, Reynolds Test. (June 15, 2010) ([Reynolds]: . . . I had intended on completing [the program] in two and a half years.").  Second, the parties agreed that at the completion of his course work, Reynolds would receive a master's degree of science in engineering, see Trial Tr. 53:4-6, Reynolds Test. (June 15, 2010) ("[Reynolds]: . . . [At the admissions presentation, Adler] also mentioned the degree was going to be a Master's of Science in Engineering, and that shocked me because of course I was expecting a Wharton degree."), and at graduation, he would receive three documents: (1) the master's degree issued by the University of Pennsylvania; (2) a certificate signed by the Deans of

---

[34]     They also disagreed, of course, over whether the terms of the contract had been breached.

both the School of Engineering and the Wharton School; and (3) a Moore Certificate,[35] which memorialized Reynolds's status as a Moore Fellow.  Trial Tr. 53:24-54:12, Reynolds Test. (June 15, 2010) (discussing the three documents that Reynolds expected to receive); Trial Tr. 82:23-83:6, Adler Test. (June 16, 2010).  Finally, the parties agreed that Reynolds was entitled to "the full advantages of being [a] Penn Engineering alumn[us], [a] Wharton alumn[us] and [a] Penn alumn[us]."  Def.'s Ex. 42 at 2.  The parties also agreed that the EMTM program was cosponsored by the School of Engineering and the Wharton School.  See Trial Tr. 24:3-8, Adler Test. (June 16, 2010) ("Q. Now it may not be important but what you wrote in here is '[i]t's cosponsored by the Wharton School of Business and the School of Engineering and Applied Sciences,' right? A.  Yeah.  The [p]rogram, yeah.  Q.  Yeah.  A.  Which is what we've always said."); Trial Tr. 77:23 - 78:1, Adler Test. (June 16, 2010) ("[Adler]: What, what it says that you'd be getting a Masters of Science in Engineering in the Management of Technology from the Engineering School and that it was cosponsored by the Wharton School and the Engineering School.").  Unlike in Lombardo, where there was no evidence of an agreement with respect to the essential contractual terms such as "time or manner of performance or price to be paid," Lombardo, 123 A.2d at 666, the agreement in the present case is sufficient to establish the essential terms of an express contract.  The contract is therefore definite enough to be enforceable.

Like in American Eagle Outfitters, the parties' disagreement arises out of two related areas of ambiguity–not indefiniteness–in the contract.  The first involves the relationship between

---

[35]    Reynolds did not dispute that the Moore certificate that he received satisfied his expectations.

the Wharton School and the School of Engineering.  The parties agree that the program is

cosponsored by the two schools but disagree on the definition of "cosponsor."  Reynolds

contends that cosponsorship implies that EMTM graduates would receive a "joint degree."  In

academic parlance, a joint degree is one that is granted by two institutions.  Trial Tr. 125:23-25,

Adler Test. (June 16, 2010).  Penn argues that, as used with reference to the EMTM program,

cosponsorship simply means that the program was "jointly sponsored" by the two schools.  Id. at

77:12-17 ("[Adler]: Joint Sponsorship.  Again, joint is being used as an adjective . . .  and it

really implies and it says that it's a partnership between the two institutions.  But it's not a joint

degree which is a noun.").  Although the difference between the two interpretations is significant,

it does not render the contract unenforceable.  It merely requires that a jury decide which

interpretation is applicable.

The second area of ambiguity is related to the first.  The parties disagree over the

definitions of "alumnus," "student" and "graduate."  Adler concedes that he told prospective

students, including Reynolds, that they could "represent themselves as alumni and as students" of

the Wharton School, the School of Engineering or the University of Pennsylvania.  Id. at 84:19-

24.  Reynolds argues that this statement constitutes a promise that he could represent himself as a

"graduate" of the Wharton School and that he would receive a degree from the Wharton School.

Trial Tr. 221:8 - 11, Reynolds Test. (June 15, 2010) ("Q.  And you think that means that the

School of Engineering grants a Wharton degree?  A.  [Reynolds]: When I combine that with all

the information that Joel gave me, absolutely.").  The terms "alumnus," "student" and "graduate"

are susceptible of more than one definition.  The jury heard extensive testimony about the

possible meanings of each.  They are thus ambiguous.  They are not, however, ambiguous

enough to render the contract indefinite. A jury is perfectly capable of resolving this "garden-variety" ambiguity. <u>See</u> <u>Am. Eagle Outfitters</u>, 584 F.3d at 585; <u>Johnston the Florist, Inc. v. TEDCO Const. Corp.</u>, 657 A.2d 511, 516 (Pa. Super. Ct. 1995) ("Furthermore, in the case of a disputed oral contract, what was said and done by the parties, as well as what was intended by what was said and done by the parties, are questions of fact to be resolved by the trier of fact[.]").

Despite the ambiguity in the contract, I conclude that there was an express contract between Penn and Reynolds and that such contract was definite enough to be enforceable. Accordingly, I must grant JMOL in Penn's favor on Reynolds's unjust enrichment claim. <u>See</u> <u>Skepton</u>, 895 A.2d at 1254 ("the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract.").

CONCLUSION

For the reasons discussed <u>supra</u>, I will deny Reynolds's motion for a new trial. I will also grant Penn's motion for JMOL with respect to Reynolds's claim for unjust enrichment.[36] As a result of this ruling, I need not decide Penn's alternative argument that Reynolds committed fraud on the court.[37]

An appropriate Order follows.

---

[36] Rule 50 provides: "[i]f the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed." Here, Penn has not filed an alternative motion for a new trial. To the contrary, Penn asserts that "[t]here were no errors at trial that necessitate a new trial, and a new trial is not appropriate." Def.'s Br. at 1 (Doc. No. 159). Reynolds filed the only motion for a new trial. (Doc. No. 145). I have denied that motion and I find no other ground for a new trial.

[37] Reynolds's motion for prejudgment interest will be denied as moot. (Doc. No. 144).